**BAKER, WATTS & CO. et al., Plaintiffs,**

v.

**James J. SAXON, Comptroller of the Currency, Defendant.**

**Civ. A. No. 97–66.**

United States District Court
District of Columbia.

Dec. 14, 1966.

Gerhard A. Gesell, Washington, D. C., for plaintiffs.

Irwin Goldbloom, Dept. of Justice, for defendant.

David Hexter, Associate Gen. Counsel, Board of Governors, Federal Reserve System, amicus curiae.

Daniel Goldberg, New York City, for defendant intervenor, Port of New York Authority.

Ralph Huck, Chicago, Ill., for Harris Trust & Savings Bank, amicus curiae.

## OPINION

HOLTZOFF, District Judge.

The subject matter of this action relates to an aspect of the authority of commercial banks to underwrite and deal in securities issued by States and political subdivisions. This litigation presents an unusual situation in that two agencies of the Government,—the Federal Reserve System and the Comptroller of the Currency,—that administer the pertinent statutes adopt and apply divergent interpretations of a crucial provision. Consequently, the outcome of this lawsuit will not only constitute an adjudication of the rights of the parties, but will also effect a resolution of conflicting views of the two Government agencies.

The specific problem consists of an interpretation of the statutory provisions of 12 U.S.C. § 24, paragraph Seventh, which, while prohibiting commercial banks to underwrite securities or stock, or to deal in them for customers, carves out an exception for "obligations of the United States, or general obligations of any State or of any political subdivision thereof". The particular question is whether the phrase "*general* [1] obligations of any State or of any political subdivision thereof" is limited to such obligations as are supported by the taxing power, or includes all obligations issued on the full faith and credit of a State or political subdivision, even if they are not sustained by the taxing power.

The Federal Reserve System, which administers this statute in respect to State banks that are members of the System, has for many years construed and now construes the definition as being restricted to securities that are backed by the taxing power. The Comptroller of the Currency, who administers the statute in respect to national banks and who has for a long time followed the same construction, changed his position in 1963 and issued a ruling to the effect that the statutory definition is broad enough to include all securities based on the full faith and credit of the issuing political subdivision, even if that entity lacks the taxing power. For reasons discussed in this opinion, this Court adopts the more narrow construction that is applied by the Federal Reserve System.

This action is brought against the Comptroller of the Currency by a group of investment bankers. It seeks an injunction to restrain the Comptroller from authorizing national banks to underwrite and deal in obligations of States and political subdivisions that are not secured by the general power of taxation. It also prays for a declaratory judgment adjudicating the pertinent Regulation promulgated by the Comptroller to be invalid.

Two preliminary procedural matters may be noted briefly. The Government interposes the objection that the plaintiffs lack standing to sue. This objection is overruled. The gravamen of the plaintiffs' claim for relief is that they are being subjected to competition by illegal activities of national banks. While no one may maintain a suit to restrain lawful competition merely because he is suffering an economic detriment, nevertheless, a person has a standing to complain against illegal competition, or specifically, against competition on the part of a person who lacks the legal right or power to pursue the competitive activities. In this respect this action is precisely parallel to cases in which a State bank has been permitted to maintain suit to restrain the Comptroller of the Currency from granting permission to a national bank to establish a branch that would compete with the plaintiff.

---

1. Emphasis supplied.

Commercial State Bank of Roseville v. Gidney, D.C., 174 F.Supp. 770, affirmed 108 U.S.App.D.C. 37, 278 F.2d 871; National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6th C.). See also City of Chicago v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 83, 78 S.Ct. 1063, 2 L.Ed.2d 1174.

The line of cases on which the Government relies and that are well represented by Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and other similar decisions, are distinguishable. Their progenitor is a doctrine enunciated in Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L. Ed. 1078, to the effect that a person may not maintain a suit to enjoin the use of Government funds, even if such use is claimed to be in violation of law. The fact that the plaintiff is suffering an economic detriment from competition assisted by a loan or grant of Government funds, does not give him a standing to sue. This doctrine is entirely different from the principle that permits one to bring an action to enjoin an illegal activity on the part of a competitor, or to restrain the illegal authorization by the Government of an unlawful competitive undertaking.

So, too, a justiciable controversy obviously exists justifying the Court in entertaining an action for a declaratory judgment. The plaintiffs claim that the defendant is authorizing national banks to conduct certain activities in violation of law and that these activities transgress the powers of the banks and that they are injurious to the plaintiffs. In any event the action has a double aspect, since it is a suit both for a declaratory judgment and an injunction.

The Port of New York Authority, a political subdivision created jointly by the States of New York and New Jersey, has been permitted to intervene as a defendant in support of the Comptroller's position. The relation of this intervenor to the controversy is, however, merely that of a potential issuer of bonds, desiring an opportunity to deal through commercial banks, as well as through investment bankers, apparently in order to increase competition among prospective underwriters and thereby possibly secure more desirable terms. Its interest in the present controversy is manifestly indirect and remote.

Having completed the foregoing summary and considered possible procedural objections, we are ready to enter on an intensive discussion of the subject matter involved in this litigation. The tragic debacle that shook the banking community in the late 1920's, led to a thorough, comprehensive and fruitful Congressional investigation. It was found that one of the principal causes of the catastrophe had been the growing practice of commercial banks to enter into the field of investment banking, that is underwriting issues of securities, and buying and selling securities to customers. The result was that undesirable securities were at times foisted upon the public, and that funds of banking institutions that should have been devoted to the customary commercial banking transactions were directed to other enterprises, some of which proved of doubtful desirability. Many other evils and abuses also arose. Congress definitively and unalterably determined to compel commercial banks to return and confine themselves to their classic time-honored functions: acceptance of deposits of money subject to withdrawal by check or other means; discount of commercial paper; and making loans. The function of investment banking was to be divorced from commercial banking. Drastic provisions were enacted to that end. Thus by the Act of June 16, 1933, 12 U.S.C. § 378, often known as the Glass-Steagall Act, concerns engaged in underwriting, selling or distributing securities, were prohibited to receive deposits subject to check or repayment by other means. To prevent evasion by the use of affiliates, the same Act provided that no person engaged in the issue, flotation, underwriting, public sale, or distribution of securities, and no officer, director, or employee of any corporation, or a partner or employee of any partnership, engaged

in any of these lines of endeavor, should serve as an officer, director, or employee of any bank that was a member of the Federal Reserve System, 12 U.S.C. § 78. No member bank was permitted to be affiliated in any manner with any concern engaged in the issue, flotation, underwriting, public sale, or distribution of securities, 12 U.S.C. § 377. Some of the violations of these prohibitions were made punishable by criminal penalties, 12 U.S.C. § 378(b).

The specific provision involved in this litigation, which was also a part of the Act of June 16, 1933, 12 U.S.C. § 24, paragraph Seventh, reads in part as follows:

"The business of dealing in securities and stock by the association [i.e. banking institution] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock."

\*    \*    \*    \*    \*    \*

"The limitations and restrictions herein contained as to dealing in, underwriting and purchasing for its own account, investment securities shall not apply to obligations of the United States, or general obligations of any State or of any political subdivision thereof, \* \* \*."

It was also provided in this statute that State banks that were members of the Federal Reserve System should be subject to the same limitations and conditions with respect to the purchasing, selling, underwriting, and holding of investment securities and stock as were applicable to national banks, 12 U.S.C. § 335.

Thus practically the entire commercial banking system of the United States, composed of national banks and the vast majority of State banks that were members of the Federal Reserve System was encompassed by the far-reaching prohibitions against engaging in the business of investment banking.

The precise question to be determined is what is meant by the term "general obligations of any State or of any political subdivision thereof" that were excepted from the ban. The Federal Reserve System, which administers this Act as to State banks that are members of the System, has for over a quarter of a century continuously construed the term "general obligations" and now construes it, as obligations that are backed by the taxing power. This interpretation was likewise followed by the Comptroller of the Currency, after some vacillation in the few years immediately following the enactment of the law. In 1963, however, the Comptroller who administers this Act in respect to national banks, changed his position and announced that he would construe the term "general obligations" as comprizing any obligations whatever that were issued on the full faith and credit of the issuing State or subdivision, even if the issuing entity was bereft of the taxing power. This interpretation enables national banks to underwrite and deal in various issues of securities of States and political subdivisions that are not backed by the general taxing power. Bonds issued by the Port of New York Authority are an outstanding example, although there are many others.

Thus, we find the anomalous and chaotic situation of the statute being applied in one way to State banks that are members of the Federal Reserve System, and in an entirely different manner to national banks, merely because two different agencies administer the law in respect to these two groups of institutions.

This cleavage resulted from the promulgation of a Regulation by the Comptroller of the Currency on September 12, 1963, reading as follows, 12 C.F.R. § 1.3, par. (e):

"(e) The phrase 'general obligations of any State or of any political subdivision thereof' means an obligation supported by the full faith and credit of the obligator. It includes an obligation payable from a special fund when the full faith and credit of a State or

any political subdivision thereof is obligated for payments into the fund of amounts which will be sufficient to provide for all required payments in connection with the obligation. * * "

It will be observed that the effect of this Regulation is to extend the definition of "general obligations" so as to abrogate the requirement that they must be backed by the general taxing power. It is this Regulation that is under attack in this case.

The Federal Reserve System apparently noting this departure from previous moorings, responded on November 27, 1963 by a statement having the effect of a regulation, 12 C.F.R. § 208.107, paragraphs 4 and 5, the pertinent portions of which are as follows:

"(4) The authority of the Comptroller of the Currency to issue investment regulations pursuant to R.S. 5136 does not include authority to exempt additional kinds of securities from the prohibition against underwriting or the prohibition against investing more than 10 percent of capital and surplus in securities of any one obligor. Despite this, § 1.3 of this title, the Comptroller's recent revision of the Investment Securities Regulation, contains a definition of 'public security' and § 1.4 of this title states that 'A bank may deal in, underwrite, purchase and sell for its own account a public security subject only to the exercise of prudent banking judgment' * * * the terms of the regulation would authorize such banks to underwrite some securities of public corporations that are payable solely out of revenues derived from the operation of a tunnel, turnpike, bridge, or the like, despite the fact that the applicable statute does not exempt such securities from the general prohibition against underwriting by banks.

"(5) Since the Comptroller is not authorized by law to expand the category of exempt securities * * *, the current regulation does not have the force and effect of law insofar as it attempts to do this. Accordingly, member State banks are informed that, in the opinion of the Board of Governors, the only securities that are exempt from the limitations and restrictions of paragraph Seventh are those specified in R.S. 5136 * * * Since so called 'revenue obligations' of the kinds mentioned above, as well as other revenue obligations, are not exempt from the limitations and restrictions of R.S. 5136, it would be unlawful for a member State bank to underwrite such securities."

It will be observed that the Board of Governors thus warned State banks that are members of the Federal Reserve System, not to be guided by the Comptroller's expanded ruling.

On May 8, 1964, the Board of Governors reiterated its views on the subject, 12 C.F.R. § 208.109 as follows:

" * * *, the Board understands that phrase [i.e. general obligations] to include only obligations that are supported by an unconditional promise to pay, directly or indirectly, an aggregate amount which (together with any other funds available for the purpose) will suffice to discharge, when due, all interest on and principal of such obligations, which promise (1) is made by a Governmental entity that possesses general powers of taxation, including property taxation, and (2) pledges or otherwise commits the full faith and credit of said promisor; said term does not include obligations not so supported that are to be repaid only from specified sources such as the income from designated facilities or the proceeds of designated taxes.

"(e) A major requirement of the foregoing definition is that a 'general obligation' must be supported by general powers of taxation."

As we have already indicated, national banks are permitted for the moment to underwrite and deal in securities issued by States or political subdivisions, even if the issuing entity lacks general powers of taxation, while member banks that operate under State charters are restricted to underwriting and dealing only

in those securities that are backed by the general taxing authority. Manifestly, Congress did not intend or contemplate such a fortuitous differentiation. It is cogently argued by counsel for the Board of Governors, that both prior to and since the passage of the Banking Act of 1933, the generic term "general obligations" has been customarily used and understood in the field of Government finance as referring to promises of payment made by a Governmental entity that possesses general powers of taxation and that are sustained by the full faith and credit of the promisor. Strong support is lent to this argument by the fact that prior to September 1963, the Comptroller of the Currency concurred and applied this definition of the term "general obligations" in the same manner in which it was understood and administered by the Federal Reserve System.

While there is a paucity of judicial authorities on the subject, it was held by the Supreme Court of Oregon, in City of Eugene v. Willamette Valley Co., 52 Or. 490, 97 P. 817, 821, that the phrase "general obligations" means, "a municipal debt, for the payment of which provision must be made by devoting funds raised by taxation, thereby appropriating in discharge thereof a pro rata share of the burden upon all property in a specified district that is subject thereto." No authorities have been cited to the contrary.

■ The origin of the legislation, as has been heretofore shown, conclusively demonstrates that it was the unalterable and emphatic intention of Congress to divorce commercial banks from the business of underwriting and dealing in securities. Congress has never deviated from its position ever since the passage of the Act of 1933. It carved out an exception at the time for securities of Governmental bodies of certain limited types. No basis is discernible for broadening that exception. On the contrary, the original objective of the Congress should not be weakened or impaired unless it be by later legislative action.

■ In the light of the foregoing considerations, the Court adopts the construction of the term "general obligations" as being limited to those that are issued by a Governmental entity endowed with the general taxing powers, and that are based on the full faith and credit of the issuing entity.

This limitation must not be deemed as an intimation that securities excluded from the classification may perhaps be in an inferior category. Such inference is not warranted. It may well be that some securities that are outside of the scope of the definition are more desirable than some others that are within the permitted group. Some securities that are ordinarily considered "gilt-edged" may indeed be found in the excluded class. The sole purpose of the restriction is to impose a strict limitation on any attempts of commercial banks to enter into the field of investment banking.

Accordingly the motion of the plaintiffs for summary judgment is granted. The motions of the defendant and defendant-intervenor for summary judgment are denied.

Counsel may submit an appropriate order.