**A. G. BECKER INCORPORATED,
Plaintiff,**

v.

**BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
et al., Defendants.**

**SECURITIES INDUSTRY
ASSOCIATION,
Plaintiff,**

v.

**BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
et al., Defendants.**

**Civ. A. Nos. 8–2614, 80–2730.**

United States District Court,
District of Columbia.

July 28, 1981.

Harvey L. Pitt, Henry A. Hubschman, Edson G. Case, Jr., Fried, Frank, Harris, Shriver & Kampleman, Washington, D. C., for Becker.

John M. Liftin, James B. Weidner, Janet R. Zimmer, Rogers & Wells, Washington, D. C., for SIA.

Richard M. Ashton, Neal L. Petersen, James V. Mattingly, Jr., Federal Reserve Board, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Pending before the Court in these consolidated actions are the parties' cross motions for summary judgment and the defendant's alternative motion to dismiss, with supporting memoranda. Plaintiffs are A. G. Becker, Inc. ("Becker"), a securities broker and dealer registered with the Securities and Exchange Commission, and the Securities Industry Association ("SIA"), an organization representing over five hundred securities brokers and dealers. They challenge a decision of the Board of Governors of the Federal Reserve System ("the Board"), which, with its individual members, are the defendants in this action. The dispute presents provocative questions concerning the delicately balanced regulatory system enacted by Congress to control the activities of the nation's banks in financial markets.

In the summer of 1978, Bankers Trust Company ("Bankers Trust"), a state chartered member bank of the Federal Reserve System, began offering for sale third party commercial paper, that is, commercial paper issued by corporations not related to the bank.[1] This effort included a marketing campaign aimed at issuers of commercial paper, whereby Bankers Trust agreed to act as a seller of commercial paper, performing services competitive with securities dealers. As part of this advertising, Bankers Trust offered to lend the issuer of commercial paper money equal to the amount of paper to be sold and, if the bank were unable to sell all of the issuer's paper, to take back notes reflecting the amount of paper unsold.

Becker and SIA expressed concern to the staff of the Board of Governors as to the legality of Bankers Trust's actions in a letter sent in November, 1978. Following this correspondence, plaintiffs, along with the General Counsel of the Securities and Exchange Commission ("SEC") and Bankers Trust, filed memoranda arguing over whether the sale by Bankers Trust of third party commercial paper violated certain provisions of the Banking Act of 1933 known as the Glass-Steagall Act. On June 28, 1979, after a meeting with representatives of Becker and SIA, the General Coun-

---

1. A succinct definition of commercial paper is offered in Comment, *The Commercial Paper Market and the Securities Acts*, 39 U.Chi.L. Rev. 362 (1972):

 Commercial paper consists of unsecured, short-term promissory notes issued by sales and personal finance companies; by manufacturing, transportation, trade, and utility companies; and by the affiliates and subsidiaries of commercial banks. The notes are payable to the bearer on a stated maturity date. Maturities range from one day to nine months, but most paper carries an original maturity between thirty and ninety days. When the paper becomes due, it is generally rolled over—that is, reissued—to the same or a different investor at the market rate at the time of maturity.

 Id. at 363–64 (footnotes omitted).

sel of the Board issued a document entitled "Commercial Paper Activities of Commercial Banks: A Legal Analysis," which concluded that state member banks may, subject to certain limitations, sell third party commercial paper. The General Counsel offered, upon request by Becker or SIA, to recommend that the Board review his opinion. SIA, on July 26, 1979, and Becker, on January 31, 1980, requested that the Board review the General Counsel's opinion and that, in connection with that review, they initiate proceedings against Bankers Trust for violating the Glass-Steagall Act.[2]

The Board took up the matter presented by the Becker and SIA petitions and, on September 26, 1980, issued a letter and a Statement Regarding Petitions to Initiate Enforcement Actions declaring that commercial paper was not a security within the meaning of the Glass-Steagall Act and that therefore Bankers Trust could legally sell third party commercial paper. The Board expressed concern at some potentially unsound practices that might have developed as a result of its ruling, and therefore commenced the drafting of guidelines governing the sale by state member banks of commercial paper.[3] Soon thereafter, the plaintiffs commenced this action seeking judicial review of the Board's conclusion that Bankers Trust was acting within the parameters of the Glass-Steagall Act in offering for sale third party commercial paper.[4]

2. Because it may affect the jurisdiction over this action, the parties dispute vigorously whether plaintiffs requested that the Board initiate cease and desist proceedings. Suffice it to quote from plaintiffs' precise language:

This application is intended to ... renew the SIA's request for formal action by the Board requiring Bankers Trust Company to cease and desist from its illegal activities. (Application of SIA for Review of State Member Bank Action, July 26, 1979 at 3; Record at 366) (Citations to the administrative record will be made as "R. at ——").
... Applicant SIA respectfully asserts that the Board should (1) formally review this matter, (2) Order Bankers Trust to cease and desist from its third party commercial paper activity .... *Id.* at 20, R. at 383.
... this memorandum is submitted to urge the Board ... to advise Bankers Trust that its current commercial paper marketing activities are inappropriate as a matter of law and policy, and should cease. (Memorandum on Behalf of A. G. Becker Incorporated to the Staff of the Board of Governors of the Federal Reserve System Concerning the Commercial Paper Activities of Bankers Trust Company, January 31, 1980 at 3, R. at 154) The advance of Bankers Trust into the commercial paper market exceeds the boundary of any fair interpretation of where Congress intended the line to be drawn. We respectfully urge the Board, in conformity with the provisions of the Glass-Steagall Act, to issue a declaration to that effect. *Id.* at 47, R. at 198.
The petition submitted by Becker on January 31, 1979, was referred to in their letter exactly one year later seeking review of the General Counsel's opinion.

3. These guidelines were issued in the context of a policy statement on May 28, 1981, effective immediately, to govern the sale of third party commercial paper by state member banks. The Board indicated that it would accept comments on the guidelines through July 31, 1981, and that it will monitor the activities of banks in the commercial paper market to permit modification or supplementation of the guidelines as experience suggests may be fruitful. Plaintiffs' challenge to the Board's action does not include an attack on these guidelines.

4. Prior to the filing of this action challenging the substance of the Board's ruling, Becker sought relief in this Court for alleged violations by the Board of the Government in the Sunshine Act, 5 U.S.C. § 552b. On November 26, 1980, this Court issued a memorandum opinion containing a declaratory judgment that the defendants violated the Act's premeeting notice requirements but finding that in all other respects, the Board had acted lawfully. That decision, *A. G. Becker Inc. v. Board of Governors of the Federal Reserve System*, 502 F.Supp. 378 (D.D.C.1980), *appeal docketed* May 4, 1981, will be referred to as *Becker I.*

Additionally, Becker filed, concurrently with this action, a petition in the Court of Appeals for the District of Columbia Circuit, *A. G. Becker, Inc. v. Board of Governors of the Federal Reserve System*, No. 80–2258 (D.C.Cir., filed Oct. 14, 1980), seeking review of the Board's determination that the sale by state member banks of third party commercial paper did not violate the Glass-Steagall Act. The actions were filed in both courts pursuant to the suggestion in the Court of Appeals that "[i]f any doubt as to the proper forum exists, careful counsel should file suit in both the court of appeals and the district court ...." *Investment Company Institute v. Board of Governors*, 551 F.2d 1270, 1280 (D.C.Cir.1977). Becker's motion to stay its action in the Court of Appeals is pending.

■ Surfacing initially in this controversy is the question whether this court, or any court, has jurisdiction to hear this dispute and grant plaintiffs their requested relief. It is beyond dispute that agency action is reviewable absent a showing that Congress specifically and clearly intended to preclude judicial oversight. The Board in this case has the burden of demonstrating that its decision to permit state member banks to sell third party commercial paper is insulated from review. *See Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140 n.2, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). In *Independent Bankers Association of America v. Board of Governors of the Federal Reserve System,* 500 F.2d 812 (D.C.Cir.1974), the Court of Appeals declared that "non-reviewability must be established by a clear showing of Congressional intent to preclude review." *Id.* at 814. Especially where an agency has resolved a pure question of law, which the Board did when it decided that commercial paper was not subject to the proscriptions of the Glass-Steagall Act,[5] courts have a special competence and judicial review is clearly the norm. *See Natural Resources Defense Council, Inc. v. Securities and Exchange Commission,* 606 F.2d 1031, 1048 (D.C.Cir.1979).

The Board contends that the availability of judicial review is governed by the Financial Institutions Supervisory Act of 1966, as amended, which established procedures for the issuance of cease and desist orders by federal agencies with authority over the banking industry. Alternatively, it maintains that its refusal to commence enforcement proceedings against Bankers Trust is a matter committed to its discretion by law and therefore nonreviewable under the Administrative Procedure Act. The plaintiffs strenuously reject that Congress has entrusted the Board with absolute discretion over this matter, suggesting that the Board's interpretation of the Glass-Steagall Act is subject to the normal presumption favoring judicial review absent a showing by the Board of clear deprivation of the Court's jurisdiction. Neither ground for nonreviewability cited by the Board, plaintiffs contend, overcomes the doctrine that permits courts to review agency decision on questions of law.

■ The Board's initial authority for its argument that jurisdiction lacks is the Financial Institutions Supervisory Act of 1966, as amended, specifically 12 U.S.C. §§ 1818(h), (i). This legislation established procedures for the Federal Deposit Insurance Corporation, the Comptroller of the Currency, and the Board to regulate the nations financial houses and to enforce against unsafe or unsound banking practices. It provides, in pertinent part:

(h)(2) . . . any person required by an order issued under this section to cease and desist from any of the violations or practices stated therein, may obtain a review of any order . . . by the filing in the court of appeals of the United States for the circuit in which the home office of the bank is located, or in the United States Court of Appeals for the District of Columbia Circuit . . . a written petition praying that the order of the agency be modified, terminated, or set aside . . . .

. . . .

(i)(1) The appropriate Federal banking agency may in its discretion apply to the United States district court . . . within the jurisdiction of which the home office of the bank is located, for the enforcement of any effective and outstanding notice or order issued under this section, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section no court shall

---

5. Even the Board recognized that its conclusions necessitated a resolution of a legal question. *See* Letter to plaintiffs' counsel, September 28, 1980 at 3, R. at 664 (". . . the issues involved in these petitions are primarily legal in nature . . . ."); Statement Regarding Petitions to Initiate Enforcement Actions, September 28, 1980, at 28, R. at 692 (". . . the Glass-Steagall Act issues resolved by the Board are essentially legal in nature . . . .").

have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order.

Under the Board's view, its decision not to institute cease and desist proceedings and its judgment that commercial paper is not a security under the Glass-Steagall Act are insulated from judicial scrutiny by these provisions. A decision not to adjudicate whether Bankers Trust's conduct was illegal is, in the Board's opinion, analogous to decisions by the Federal Trade Commission and the General Counsel of the National Labor Relations Board exercising their "prosecutorial discretion." *See Moog Industries, Inc. v. Federal Trade Commission*, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); *Federal Trade Commission v. Klesner*, 280 U.S. 19, 46 S.Ct. 102, 70 L.Ed. 404 (1929) (both holding unreviewable a decision by the Federal Trade Commission not to institute cease and desist proceedings under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45) *and National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 138, 95 S.Ct. 1504, 1510, 44 L.Ed.2d 29 (1975); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967) (holding unreviewable a decision of the General Counsel of the Board not to issue an unfair labor practice complaint). The Board also finds shelter for this position in the language of the statute quoted above, in that an injunction directing the Board begin a proceeding to prevent Bankers Trust to sell third party commercial paper would, of necessity, "affect" the issuance of a cease and desist order and thus contravene 12 U.S.C. § 1818(i)(1).

The Board, however, ignores the procedural posture of the proceedings before it and before this Court. 12 U.S.C. § 1818(i) is a narrow statute, applying only to an "order issued under this section." § 1818 establishes a detailed procedure to govern efforts by the Board to enforce against unsafe and unsound practices. None of these procedures were followed in this case. The Act provides for proper notice, a hearing, service of the Board's findings upon the bank under investigation, and review of the Board's decision in a court of appeals. In this action, Becker and SIA submitted materials to the General Counsel, who issued a legal opinion on the meaning of the Glass-Steagall Act as applied to Bankers Trust's conduct. The General Counsel, while soliciting materials from Bankers Trust, held no formal hearing but rather worked with his staff to reach a resolution of plaintiffs' expressed concerns. He gave the plaintiffs the opportunity to request that he seek review of his own decision by the Board of Governors. Plaintiffs then sought from the Board of Governors a review of the General Counsel's legal opinion and, in connection with that review, the institution of enforcement proceedings. The Board agreed with its General Counsel and decided not to institute an adjudication against Bankers Trust. At this stage, where the plaintiffs are challenging the legal conclusion reached by the General Counsel and adopted by the Board, § 1818 does not proscribe review.

This analysis finds support in *Groos National Bank v. Comptroller of the Currency*, 573 F.2d 889 (5th Cir. 1978). The appellate court held that jurisdiction did not vest in the district court to issue a declaratory judgment against the Comptroller, but explicitly found that "the Comptroller [had] set in motion cease and desist proceedings as authorized by 12 U.S.C. § 1818." *Id.* at 892. This is not an action such as *Groos* where "this regulatory process is not to be disturbed by untimely judicial intervention," *id.* at 895, because the administrative process here has reached a final conclusion that the Glass-Steagall Act is not violated when a state member bank sells commercial paper issued by unrelated corporations.

■ Moreover, it is a well recognized exception to statutes precluding judicial review that if an agency acts beyond the scope of its statutory authority, courts may exercise jurisdiction to overturn that administrative action. *See Manges v. Camp*, 474 F.2d 97 (5th Cir. 1973) (decision of Comptroller of the Currency outside of its authority is reviewable notwithstanding

§ 1818). *See also Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) (action within discretion of National Labor Relations Board General Counsel is reviewable if he exceeds statutory authority).

 Section 1818 does, however, preclude the Court from granting plaintiffs' prayer that an injunction be issued ordering that cease and desist proceedings be commenced against Bankers Trust. *See* Becker Complaint at 11, ¶ 6; SIA Complaint at 8, ¶ 5. It is beyond the jurisdiction of this court, and probably any court, to order the Board, by injunction, writ of mandamus, or otherwise, to begin cease and desist proceedings against a bank. Such a directive would surely intrude upon the limitation set out in § 1818(i)(1), that "no court shall have jurisdiction to affect by injunction or otherwise the issuance ... of any notice or order under this section ...." It is clear, therefore, that the Court's power to grant relief in this action is limited to reviewing the legal conclusion reached by the Board concerning the meaning of the Glass-Steagall Act, and to issuing whatever declaratory order may be appropriate.

As a second and independent ground for its argument that the Court lacks jurisdiction, the Board maintains that its decision that Bankers Trust is not violating the Glass-Steagall Act is wholly within its discretion and therefore unreviewable. The Administrative Procedure Act deprives courts of jurisdiction where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court of the United States has interpreted this withdrawal of jurisdiction as predicated on a showing that nonreviewability must "fairly be inferred," from the regulatory framework, *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970), and that the statutes are drawn such that "there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

 Whether a statute is drawn so broadly that there is no law to apply "turns on pragmatic considerations as to whether

an agency determination is the proper subject of judicial review." *Natural Resources Defense Council v. Securities and Exchange Commission*, 606 F.2d 1031, 1043 (D.C.Cir. 1979). In that decision, the Court of Appeals set out the proper focus of the inquiry:

> ... we first identify as precisely as possible the aspects of the agency's action against which the challenge is brought. We then evaluate the relevance of three particularly important factors: the need for judicial supervision to safeguard the interests of the plaintiffs; the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and the appropriateness of the issues raised for judicial review. Finally, we inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review.

*Id.* at 1044 (citations omitted).

The exact agency action under attack in this case is the Board's ruling that the Glass-Steagall Act is not violated when a state member bank sells third party commercial paper. The Board attempts to characterize its decision as based on more than a purely legal analysis, but this is just not the case. Although the Board solicited materials from Bankers Trust on its activities, it chose expressly not to rely on this factual material. In the Board's statement it concluded,

> Since, in the Board's opinion, the stronger argument is that commercial paper should not be treated as a security covered by the Glass-Steagall Act, the restrictions of the Act with regard to issuing, underwriting, selling, and dealing in securities do not apply. Thus, it is not necessary to reach the issue of whether the activities engaged in by Bankers Trust are prohibited by the Act.

R. at 688. Notwithstanding the Board's reliance on its special knowledge of the commercial paper market, once it decided not to address any factual matters underlying Bankers Trust's activity, it transformed

the proceeding into a purely legal inquiry. Thus, the background of this dispute is materially different from that faced in *New York Stock Exchange v. Bloom*, 562 F.2d 736 (D.C.Cir.1977), *cert. denied* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978), where the Court of Appeals decided to dismiss as unfit for review a petition seeking reversal of a decision of the Comptroller of the Currency that a specific automatic stock-investment plan did not violate the Glass-Steagall Act. In that case, the Court expressly noted that the Comptroller had assessed factual matters beyond a mere interpretation of the Act. But the Court was explicit as to how a pure legal question would be presented: "No doubt determining the general interest of Congress from the language and history of the Act is a matter of law . . . ." *Id.* at 741. A perusal of the Board's statements associated with its decision reveals that the Board resolved just a legal question in response to the Becker and SIA petitions. A weighing of the factors then set out in *Natural Resources Defense Council, supra,* leaves little doubt that the question presented is not only appropriate for review, but also demands judicial oversight in order to render a proper statutory interpretation.

Although the Board had discretion to make its legal decision, that discretion is neither absolute nor unreviewable. Rather, it represents the sort of administrative adjudication that has been held reviewable in the federal courts for "legal error, procedural defect or abuse." L. Jaffe, *Judicial Control of Administrative Action* 362–63 (1965). *See Nader v. Saxbe*, 497 F.2d 676, 679–80 n. 19 (D.C.Cir.1974). In *Natural Resources Defense Council*, it was noted that the Administrative Procedure Act itself "command[s] an exacting judicial scrutiny" of agency determinations of "pure questions of law." 606 F.2d at 1048. *See* 5 U.S.C. §§ 706(2)(B), (C), (D). It is difficult

to imagine an issue more suited to judicial review than the Board's determination; indeed, the Board's contentions on the merits of this litigation are predicated almost wholly on canons of statutory interpretation and an analysis of legislative history, which belie its claim that there is no law to apply. Moreover, the Board made no showing that review in this case would hamper its effectiveness in the future. It merely maintained that courts should not direct that a specific enforcement tool be chosen, and that the statute's lack of guidance as to when a cease and desist order is appropriate should be respected. Although it is true that § 1818 offers scant direction governing when the Board should institute cease and desist proceedings, whether the Board's legal conclusion is proper rests on inquiries familiar to all courts.

Further, the Board's suggestion that nonreviewability can fairly be inferred from the statutory framework is flawed. Defendants contend that § 1818(b)(1) suggests that courts should not interfere in actions such as this. That section provides that "[i]f in the opinion of the appropriate . . . agency, any insured bank" has violated the law or engaged in an unsafe practice, "the agency may issue" a notice of charges to initiate enforcement proceedings." This section neither expressly nor impliedly affects the review of purely legal determinations. It merely leaves the Board with discretion to decide when to initiate enforcement proceedings. The Board's characterization of its discretion sweeps too broadly, because it attempts to apply this narrowly drawn enactment to insulate from review any ruling on a wholly legal issue as long as the decision is somehow related to the institution of enforcement actions.[6]

The parties' positions as to the exact nature of the Board's action are not entirely illuminating because, in one sense, they are all only partially accurate. The plaintiffs

---

6. The parties briefed and argued the question whether the Board's decision was ripe for resolution in this Court because, at the time the motions were filed, the Board had not issued the promised guidelines to guard against what it thought to be potential unsafe practices re-

sulting from a state member bank's sale of third party commercial paper. When these guidelines were issued, however, *see* n. 3, *supra*, this issue evaporated from this controversy and hence will not be addressed.

assert (and it would be difficult to contravene), that the Board issued a ruling on a question of law, *i. e.*, that state member banks, under the Glass-Steagall Act, could permissibly sell third party commercial paper. The Board correctly notes, though, that this decision was pronounced in the context of deciding whether to initiate cease and desist proceedings against Bankers Trust. Neither the judicial nor the administrative processes provide for decisions on legal questions in a vacuum; each dispute is occasioned by factual developments that give rise to a particular problem. The difficulty courts face is in effectuating the delicate balance between the smooth exercise of administrative discretion in areas where agencies have expertise and the right of a party aggrieved with an administrative agency's interpretation of a legal question to seek judicial review.

The statutory scheme created in § 1818 precludes judicial interference in the enforcement processes until the appropriate stage, but nothing in § 1818, nor even in traditional canons of administrative law, prevents this Court from reviewing the propriety and correctness of the Board's legal determination that state member banks may sell third party commercial paper.[7] To hold that jurisdiction is absent here would be to vest the Board with unreviewable discretion in any proceeding, limited only to facts presented, to resolve broad legal questions that are particularly within the competence of the courts to decide. Since the Court may not intrude into the congression-

ally sanctioned enforcement procedures set out in § 1818, and cannot therefore enjoin the Board to institute cease and desist proceedings, the Court's authority is restricted to resolution of the legal question presented and the grant of equitable relief consonant with that decision, within the bounds of appropriate judicial review.[8]

Before proceeding to consider the substance of the Board's conclusion, the parties vociferously dispute the degree of deference to be given the Board's expertise in the regulation of commercial banking in the United States. The Board suggests that its decision is immune from judicial alteration unless arbitrary, capricious, or wholly irrational. Plaintiffs contest this claim, pointing out that they challenge the Board's ruling on a legal question, reversal of which is mandated by the Administrative Procedure Act if not in accordance with the statute. 5 U.S.C. § 706.

Amidst these opposing contentions the Court of Appeals has recently reaffirmed the Court's delicate role in deciding cases such as these:

> We are fully aware of the deference due the construction placed on a statute by an agency charged with the responsibility for administering it . . . . However, to accord deference is not to abdicate our duty to construe the statute, for the "courts are the final authorities and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frus-

---

7. This decision by the Board will undoubtedly have far reaching effect, much broader than merely permitting Bankers Trust to continue its commercial paper activity. The Board itself, as it issued guidelines for all banks to follow, recognized that many banks were likely to adopt the route of Bankers Trust.

8. Although not raised by the parties, one final point on the jurisdictional issue warrants mention. In *Becker I*, the Court found that the Board's closure of its meetings on the petitions of Becker and SIA satisfied exemption 10 of the Sunshine Act, 5 U.S.C. § 552b(c)(10), which permits an agency to refuse to open a meeting concerning a decision to participate in adjudicatory proceedings, because the possibility of cease and desist proceedings was raised and

discussed. That finding does not foreclose the determination that the matter on review at this time is the legal determination reached by the Board in conjunction with its decision not to initiate an action against Bankers Trust. The part of the Board's decision which rejected any enforcement proceeding against Bankers Trust is not subject to review, and to the extent that it was likely that proceedings against Bankers Trust might be discussed at the meetings, the Court remains convinced that the meetings were properly closed. That cease and desist proceedings may have been mentioned, however, does not assault the Court's authority to review the Board's resolution of the legal question at issue herein.

trate the congressional policy underlying a statute.' "

*National Association of Recycling Industries, Inc. v. Interstate Commerce Commission,* 660 F.2d 795 at 798–99 (D.C.Cir., 1981). Specifically with regard to federal banking legislation, the Supreme Court has recognized the expertise of the Board in interpreting and administering that statute. *See Board of Governors v. Agnew,* 329 U.S. 441, 450, 67 S.Ct. 411, 415, 91 L.Ed. 408 (1947). Nonetheless, the duty to examine the Board's rule to ensure its accordance with the law cannot be shirked. In *National Distributing Co. v. United States Treasury Department,* 626 F.2d 997 (D.C.Cir.1980), the Court noted,

> This Court is vested by statute with the authority and responsibility to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." ... We are required to "hold unlawful and set aside agency action, findings, and conclusions found to be ... not in accordance with the law[.]"

*Id.* at 1019, *quoting* the Administrative Procedure Act, 5 U.S.C. § 706.

Some illumination of the statutory framework surrounding this litigation is appropriate. The Glass-Steagall Act was part of a package of banking reforms passed during the early part of the Presidency of Franklin Delano Roosevelt. Two of its sections are pertinent to this dispute:

> Section 16 (12 U.S.C. § 24) Corporate Powers of Associations
>
> *Seventh* .... The business of dealing in securities and stock by the association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the *association shall not underwrite any issue of securities or stock: Provided,* That the association may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation pre-

scribe.... As used in this section the term "investment securities" shall mean marketable obligations, evidencing indebtedness of any person, copartnership, association or corporation in the forms of bonds, notes and/or debentures commonly known as investment securities under such further definition of the term "investment securities" as may be prescribed by the Comptroller of the Currency.

> * * * * * *

> Section 21 (12 U.S.C. § 378) Dealers in securities engaging in banking business; individuals or associations engaging in banking business; examinations and reports; penalties.
>
> (a) After the expiration of one year after June 16, 1933, it shall be unlawful—
>
> (1) For any person, firm, corporation, association, business trust, or other similar organization, *engaged in the business of issuing, underwriting, selling or distributing,* at wholesale or retail, or through syndicate participation, *stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits* subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt .... (Emphasis added).

These provisions are made applicable to state member banks by 12 U.S.C. § 355.

The plaintiffs contend that the Board's decision contravenes the plain meaning of the Glass-Steagall Act because Bankers Trust, an institution in the business of receiving deposits, is, in their view, selling or underwriting commercial paper, which the plaintiffs argue is a security.

The first question to be addressed, then, is whether commercial paper is in fact a "note or other security" for purposes of the Glass-Steagall Act. In its statement asserting several legal bases for accepting the General Counsel's opinion, and in this litigation, the Board has attempted to justify its decision that commercial paper was not included in the Glass-Steagall Act. § 21, the Board argues, was not intended to prohibit traditional banking functions, and the sale

by Bankers Trust of third party commercial paper resembles other banking functions such as the sale of notes and bankers' acceptances to other lenders and the issuance of certificates of deposits. A decision that commercial paper is included within the Act's prohibition would, the Board suggests, jeopardize a host of traditional banking functions. Additionally, the Board analyzed the transaction involved in the sale of third party commercial paper and concluded that such activity resembled a loan, not a sale of securities. Although Congress did not, in 1933, specifically allude to commercial paper in the proceedings over Glass-Steagall, the Board points to indirect evidence that commercial paper was not intended to be included in the definition of "notes or other securities."

Plaintiffs maintain that the plain meaning of the Glass-Steagall Act prohibits exactly what Bankers Trust is doing, mixing the business of banking with the commerce of dealing in securities. The plaintiffs characterize the defendant's "parade of horribles" as irrelevant, because the traditional activities referred to by the Board are specifically permitted by other sections of the banking laws. In the plaintiffs' view what distinguishes Bankers Trust's conduct from other, more traditional banking functions, is the unique role of Bankers Trust, functioning between the issuer and the purchaser of commercial paper. That role, the plaintiffs contend, is precisely what Congress intended to eliminate by its strict separation of investment banking from normal depository banking. Further, plaintiffs reject the Board's "functional analysis" that commercial paper is much like a loan, contending that the Board ignored the role of the bank in examining the transaction between the issuer of commercial paper and the purchaser. The plaintiffs also focus on the legislative history of the Glass-Steagall Act to support their position, citing, too, the Securities Act of 1933, which defines "securities" explicitly to include commercial paper. The Congress, plaintiffs proclaim, plainly sought to separate all dealing in speculative and other investments from the normal, more stable business of banking.

All statutory analysis begins with the recognition of an essential truth: "In any case concerning the interpretation of the statute, the 'starting point' must be the language of the statute itself, *Lewis v. United States*, 445 U.S. 55 [100 S.Ct. 915, 63 L.Ed.2d 198] (1980) . . . ." *National Association of Recycling Industries, Inc. v. Interstate Commerce Commission*, 660 F.2d 795 at 799 (D.C.Cir.1981). *See also Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Also entrenched in statutory interpretation is the principle that where a statute is not ambiguous, the party attempting to avoid its plain language must offer "persuasive reasons" for concluding that Congress did not mean what it said. *Higgins v. Marshall*, 584 F.2d 1035, 1037 (D.C.Cir.1978), *cert. denied* 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979). *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed. 117 (1978). The plain meaning of a statute may be avoided where there has been a significant change of circumstances since enactment or when a literal reading leads to an unreasonable or absurd result. *Consumers Union of the United States, Inc. v. Heimann*, 589 F.2d 531, 534 (D.C.Cir.1978).

What does a "plain" reading of the Glass-Steagall Act then reveal? Defendants cannot and do not seriously dispute that commercial paper is a "note or other security" as mentioned in Section 21. The parties agree that commercial paper consists of short-term, negotiable, usually prime quality and unsecured notes. That under a strict reading of the Act, commercial paper would be covered by Section 21 is bolstered by the Court in *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (hereinafter *ICI I* or *Camp*) that "[t]here is nothing in the phrasing of either § 16 or § 21 that suggests the narrow reading of the word 'securities.' To the contrary, the breadth of the term is implicit in the fact that the antecedent statutory language encompasses not only equity securities but

also securities representing debt." *Id.* at 635, 91 S.Ct. at 1101. Indeed, the statutes' unambiguous reference to "notes and *other* securities" surely indicates Congress's interpretation that the term "securities" encompassed "stocks, bonds, debentures and notes" in section 21. This meaning ascribed to section 21 applies with equal force to section 16, which does not mention "notes," but refers rather to "securities or stocks." *See Fortin v. Marshall*, 608 F.2d 525, 528 (1st Cir. 1979) (giving same words identical meanings in a single statute).

Does this strict interpretation of the Glass-Steagall Act lead to absurd and outrageous results? In the Board's view, many traditional commercial banking functions would simply grind to a halt were this Court to rule for plaintiffs, but their fears appear greatly exaggerated. Section 16 of the Glass-Steagall Act clearly recognizes that banks may discount and negotiate promissory notes as part of their traditional lending functions. Moreover, this Court is not presented with a broad-scale attempt by plaintiffs to reorganize the entire commercial banking industry. Rather, holding commercial paper to be included in the prohibition of the Glass-Steagall Act yields no great damage to the foundation of commercial banking. Whatever the Board decides to undertake as a result of the declaration herein is neither predicted nor directed, but when it recognizes that third-party commercial paper is a "note or other security," its mandate under the law will have been fulfilled.[9]

Reliance on the literal language of sections 16 and 21 is supported by the 1971 decision in *ICI I.* In *Board of Governors of the Federal Reserve System v. Investment Company Institute*, 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981) (hereinafter *"ICI II"*) Mr. Justice Stevens described the *Camp* decision:

> In *Camp* the Court *relied squarely on the literal language of §§ 16 and 21 of the Glass-Steagall Act.* After noting that § 16 prohibited the underwriting by a national bank of any issue of securities and the purchase for its own account of shares of stock of any corporation, and that § 21 prohibited corporations from both receiving deposits and engaging in issuing, underwriting, selling, or distributing securities, *the Court recognized that the statutory language plainly applied* to a bank's sale of redeemable and transferable "units of participation" in a common investment fund operated by the bank.

*Id.,* 101 S.Ct. at 986 (emphasis added). See generally Clark and Saunders, *Judicial Interpretation of Glass Steagall: The Need for Legislative Action*, 97 Banking L.J. 721 (1980) (noting that courts traditionally invoke a literal interpretation of the Glass-Steagall Act).

**9.** The Board decided that commercial paper was not an investment security and then swept to the conclusion that if the Court held that commercial paper was a note or security, banks would be completely precluded from purchasing commercial paper. This, the Board contends, is an absurd result justifying rejection of the plain statutory language. The Board's contention that commercial paper is not an investment security, however, is not persuasive.

Section 16 grants to the Comptroller of the Currency the discretion to classify some securities as investment securities to permit banks to purchase them for their own account. The Comptroller's regulations specify that an investment security is "a marketable obligation in the form of a bond, note, or debenture which is commonly regarded as an investment security" that is not "predominately speculative in nature." 12 C.F.R. § 1.3(b). The Bank points

to the legislative history of the McFadden Act of 1927 where Congressman McFadden clearly states that commercial paper was not considered an investment security. *See* 67 Cong. Rec. 3232 (1926). Plaintiffs indicate, however, that the McFadden Act was eviscerated by the Glass-Steagall Act in that Congress rejected the notion that commercial banks could be engaged in the investment banking business, a premise recognized by the McFadden Act. Additionally, plaintiffs submitted a letter from the Chief National Bank Examiner, dated March 10, 1981, in a matter unrelated to this dispute, where it is held that what is a loan for one purpose may be a security for another. Becker Reply Mem., Exh. 3. Banks could, even in light of the Court's holding, continue to purchase commercial paper as they traditionally have, and plaintiffs' arguments do not appear inconsistent with the scheme of the Glass-Steagall Act.

The broad framework of the Glass-Steagall Act demonstrates that Congress intended to pass a flat prohibition against any single type of institution—commercial or investment banking—from engaging in any of the badges incident to the others' enterprise. The statute draws broad lines, leaving no room for administrative amendment. It reflects "the unalterable and emphatic intention of Congress to divorce commercial banks from the business of underwriting and dealing in securities." *Baker, Watts & Co. v. Saxon*, 261 F.Supp. 247, 252 (D.D.C. 1966), *aff'd sub nom. Port of New York Authority v. Baker, Watts & Co.*, 392 F.2d 497 (D.C.Cir.1968). Deemed a "drastic step," the Glass-Steagall Act prohibits "commercial banks, banks that receive deposits subject to repayment, lend money, discount and negotiate promissory notes and the like, from going into the investment banking business." *ICI I*, 401 U.S. at 629, 91 S.Ct. at 1098. The Act "was a prophylactic measure directed against conditions that the experience of the 1920's showed to be great potentials for abuse." *Id.* at 639, 91 S.Ct. at 1103. The Court in *ICI I* further applied "as they were written" the Act's "literal terms" to overturn a decision of the Comptroller of the Currency to permit commercial banks to operate investment funds. *Id.*

This reading of the Glass-Steagall Act's framework is different from the Bank Holding Company Act of 1956, analyzed by the Supreme Court in *ICI II*. That statute authorizes the Board to determine whether a given activity is sufficiently related to banking to permit a nonbanking subsidiary of a bank holding company to engage therein. *See ICI II*, 450 U.S. at 73, 101 S.Ct. at 990. The Bank Holding Company Act clearly provides for the sort of discretionary decision made by the Board in this dispute, as it might be applied to a subsidiary of a bank holding company. But nowhere in the Glass-Steagall Act is the Board authorized, despite the plain language of the statute, to permit a bank to engage in a particular activity because it does not pose risks to consumers or investors. Indeed, as the Court in *ICI I* recognized,

> From the perspective of competition, convenience, and expertise, there are arguments to be made in support of allowing commercial banks to enter the investment banking business. But Congress determined that the hazards [of that choice] made it necessary to prohibit this activity to commercial banks.

*ICI I*, 401 U.S. at 636, 91 S.Ct. at 1101. Indeed, with the exception of the delegation in Comptroller of the Currency to determine what is an "investment security," there are no lines to be drawn.

The parties delve into the legislative history of the Glass-Steagall Act, neither producing convincing evidence of how Congress might have answered the question posed by this case were it presented in 1933. Nowhere in the record of the Act do the drafters define whether commercial paper is a note or other security. The defendants suggest that the Congress recognized that transactions in commercial paper were part of traditional banking practices at the time the Act was passed, and not part of the speculative business that gave rise to the prohibitions contained in the Act. Indeed, Senator Glass, whose name the Act bears, proposed during a debate on the Securities Act of 1933 that short term notes, including "nine months' commercial paper," be excluded from the definition of security contained in that legislation because such a definition would "radically interfere" with "ordinary commercial banking transactions." *Securities Act: Hearings on S. 875 before the Senate Committee on Banking and Currency*, 73d Cong., 1st Sess. 98 (1933). Plaintiffs counter that although banks were traditionally large purchasers of commercial paper, their role as seller was limited to occasional transactions; indeed, Congress's rejection of Senator Glass's proposal demonstrates a view that commercial paper was considered a security. It is unnecessary to trace the historical development of the commercial paper market; rather, based on the undisputed facts, the role of Bankers Trust in its commercial paper transactions is an uncommon one for traditional banking in-

stitutions. Congress's silence as to commercial paper specifically, combined with the general scheme of the Act, indicates that it did not contemplate adjustments in the definition of "notes or other securities" by the Board or any other agency in an administrative proceeding.

The parties energetically dispute whether the definition of security in the Securities Act of 1933, which includes "any note," 15 U.S.C. § 77b(1), affects the interpretation of the Glass-Steagall Act. Although short term notes such as commercial paper are exempt from the registration provisions of the Securities Act of 1933, the antifraud proscriptions still apply. *See* 15 U.S.C. §§ 77c(a)(3), 77*l*(2). Defendants contend that the statutes have such different general purposes that it would be unreasonable to impute the definition of security offered in one statute to another act. *United Shoe Workers of America v. Bedell*, 506 F.2d 174, 188 (D.C.Cir.1974). Although the Securities Act of 1933 and the Glass-Steagall Act take regulatory aim at different financial institutions and markets, they were passed within three weeks of each other and designed to remedy the then existing catastrophe in the nation's financial markets. This is surely compelling evidence that the two statutes should be interpreted similarly. The district court, eventually affirmed in *ICI I* declared, "It would be inconsistent to conclude that Congress did not intend to obtain the equivalent meaning for the term 'securities' as used in the Securities Act of 1933 when it used the same term in the Glass-Steagall Act which was enacted by the same Congress." *Investment Company Institute v. Camp*, 274 F.Supp. 624, 642–43 (D.D.C.1967) (footnote omitted), *rev'd* 420 F.2d 83 (D.C.Cir.1969), *rev'd* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971).

In an analogous decision, *United States v. American Building Maintenance Industries*, 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975), the Supreme Court considered the phrase "in commerce" as it is used in the Federal Trade Commission Act and in the Clayton Act, and concluded that "since both sections were enacted by the 63d Congress, and both were designed to deal with closely related aspects of the same problem—the protection of free and fair competition in the Nation's marketplaces," the statutes should be given similar interpretations. *Id.* at 277, 95 S.Ct. at 2155. Both the Glass-Steagall Act and the Securities Act were directed at curing the perceived rampant speculation by banks, securities dealers, and individuals prior to the Crash of 1929, such activity considered the chief cause of the Great Depression; their common goals suggest the relevance of the similar definitions.

The Board's final justification for its interpretation of the Glass-Steagall Act is its "functional analysis" of a commercial paper transaction which, in its view, compels the conclusion that commercial paper is more like a loan transaction than a security sale. The Board found that commercial paper, as short-term notes, functioned to provide corporations with cash and that banks, as traditional purchasers of commercial paper, effectively loaned such money to the issuers. *See* R. 682–84. The problem with the Board's analysis emerges instantaneously: it ignores the specific conduct of the bank, glossing over whether the bank purchases commercial paper for its own account, *e. g.*, its trust department, or purchases for future sale to an outside party or arranges a transaction between purchaser and seller. The Board's analysis would also sweep into its coverage almost all devices used by businesses to raise capital—including stocks and bonds—transforming transactions unquestionably at the heart of the securities industry into permissible activity for commercial depository banks. The dispute over the Board's determination that commercial paper represents a loan reveals the problematic query presented in this challenge: when is a device to raise funds for a business a loan and when is it a security? One factor present in this matter compels the conclusion that the commercial paper at issue here

is not a loan, and that crucial aspect is the role of Bankers Trust in the transactions.[10]

This dispute is only the proverbial tip of the iceberg as to debates currently raging in the houses of Congress concerning the proper functions of commercial banks, especially in light of a more active "banking" role taken by securities' dealers. In its *amicus* memoranda, the Securities and Exchange Commission argues forcefully and persuasively that any alteration of the lines drawn by current banking statutes is for the popularly-elected Congress to undertake. Especially in light of these current efforts to reallocate the roles of depository and non-depository institutions, both the Court and the Board should refrain from unique and heretofore unprecedented interpretations of the 1933 Glass-Steagall Act which cast such a long shadow as does the Board's ruling on the Becker and SIA petitions. The realignment of our nation's financial industries is for the elected representatives of our nation to bring to fruition by comprehensive legislation, and not for fiat by judicial decree or by administrative policymaking.[11]

■ A word need be added about the exact nature of the relief to be awarded plaintiffs. As previously noted, the law prohibits any court from affecting the issuance of a cease and desist order under 12 U.S.C. § 1818. The plaintiffs have indicated that the principal relief sought is a declaratory judgment that the Board's September 26, 1980 ruling that commercial paper is not a note or security under the Glass-Steagall Act is contrary to law. Such a judgment is within the province of this Court to award, and is attached herein. The Court expresses no opinion as to what steps, if any, may be taken following the issuance of this declaratory judgment.

---

10. The Court, like the Board, does not reach the question whether Bankers Trust was actually underwriting securities in violation of the Glass-Steagall Act. The question presented herein is whether the Board erred when it concluded that commercial paper was not a security under the Act. Although the Court has offered various characterizations to Bankers Trust's conduct, by no means does this opinion mean to convey that the bank was underwriting securities.

11. Becker contends that it was denied procedural due process by the Board in that the Board denied its request for a hearing or oral argument and refused to provide advance notice to Becker of the Board's meetings. The Court, in *Becker I* has already ruled on the open meeting aspect of the litigation, and Becker had no absolute right to present an oral argument. All of the written materials submitted were sufficient to permit the Board to deny oral argument without abusing its discretion. *Arthur Lipper Corp. v. Securities and Exchange Commission*, 547 F.2d 171, 182 n.8 (2d Cir. 1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). Becker also argues that the Board received *ex parte* communications from Bankers Trust while it was deliberating on the Becker and SIA petitions. The Board proffers an affidavit of Rose L. Arnold, in charge of the Freedom of Information Office for the Board, who indicates that the material received from Bankers Trust was available for inspection in the public reading room of the Board. Its availability to Becker and to the public negates Becker's contention that this material (now a part of the administrative record, *see* R. at 476–550) was concealed or that the Board's receipt of such documents prejudiced Becker's rights.