693 F.2d 136
 224 U.S.App.D.C. 21, Fed. Sec. L. Rep. P 98,850
 A.G. BECKER INCORPORATED, Petitioner,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al.,
Respondents.
A.G. BECKER INCORPORATED, a Delaware Corporation
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, an Agency
of the United States, et al., Appellants.
A.G. BECKER, INC., Appellant,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al.
SECURITIES INDUSTRY ASSOCIATION
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al.,
Appellants.
A.G. BECKER INCORPORATED, a Delaware Corporation, Appellant,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, an Agency
of the United States, et al.
SECURITIES INDUSTRY ASSOCIATION, Petitioner,
v.
The BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et
al., Respondents.
 Nos. 80-2258, 81-2070, 81-1493, 81-2058, 81-2096 and 80-2314.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued 3 June 1982.
Decided 2 Nov. 1982.
As Amended Nov. 2, 1982.
 
 Petition for Review of an Order of the Board of Governors of the Federal Reserve System (Nos. 80-2258, 80-2314).
 Appeal from the United States District Court for the District of Columbia (D.C.Civil Action Nos. 80-02614, 80-02175, 80-02730) (Nos. 81-2070, 81-1493, 81-2058, 81-2096).
 Richard M. Ashton, Washington, D.C., with whom Michael Bradfield, Washington, D.C., was on the brief for Bd. of Governors of the Federal Reserve System, et al., appellants Nos. 81-2058 and 81-2070 and appellants/respondents in Nos. 80-2258, 80-2314, 81-1493, and 81-2096, James V. Mattingly, Jr., Washington, D.C., also entered an appearance for the Bd. of Governors of the Federal Reserve System, et al.
 James B. Weidner, New York City, with whom John M. Liftin, Washington, D.C., was on the brief for Securities Industry Ass'n, petitioner in No. 80-2314 and appellee in No. 81-2058. Janet R. Zimmer, Washington, D.C., also entered an appearance for Securities Industry Ass'n.
 Harvey L. Pitt, Washington, D.C., with whom Henry A. Hubschman and Andrea Newmark, Washington, D.C., were on the brief for A.G. Becker Inc., petitioner in No. 80-2258, appellants in Nos. 81-2096 and 81-1493, and appellee/respondent in No. 80-2070. James H. Schropp, Washington, D.C., also entered an appearance for A.G. Becker Incorporated.
 Robert S. Rifkind, New York City, entered an appearance for New York Clearing House Ass'n, amicus curiae in Nos. 81-1493, 81-2258 and 81-2096.
 Charles F.C. Ruff, U.S. Atty., Royce C. Lamberth, Kenneth M. Raisler, William H. Briggs, Jr., Asst. U.S. Attys., Washington, D.C., also entered an appearance for appellee/respondent in No. 81-1493.
 John W. Barnum and W. Michael Tupman, Washington, D.C., entered appearances for Bankers Trust Co., amicus curiae in Nos. 80-2314, 81-2058, 80-2258, 81-1493, 81-2096 and 81-2070.
 Leonard H. Becker, Steven A. Musher and Joseph McLaughlin, Washington, D.C., entered appearances for Goldman, Sachs and Co., amicus curiae in Nos. 80-2314, 81-2058, 80-2258, 81-1493, 81-2096 and 81-2070.
 Paul Gorson and Russell Stevenson, Washington, D.C., entered appearances for Securities and Exchange Com'n, amicus curiae in Nos. 81-2096 and 81-2058.
 Before TAMM and WILKEY, Circuit Judges and ROBB, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge WILKEY.
 Dissenting opinion filed by Senior Circuit Judge ROBB.
 WILKEY, Circuit Judge:
 
 
 1
 This case calls upon us to decide whether the Federal Reserve Board acted lawfully in permitting the Bankers Trust Company, a state member bank of the Federal Reserve System,[1] to act as agent in the sale of commercial paper. After Bankers Trust began marketing commercial paper, A.G. Becker, Inc., a broker-dealer in securities, and the Securities Industry Association ("SIA"), an organization representing over five hundred securities brokers and dealers, requested the Board to declare Bankers Trust's activities illegal and to bring appropriate enforcement action. Becker and the SIA contended that Bankers Trust was in violation of sections 16 and 21 of the Glass-Steagall Act ("the Act"), which prohibit commercial banks, with certain exceptions, from buying, selling, or underwriting "securities."[2] The Federal Reserve Board determined, however, that the commercial paper marketed by Bankers Trust was not a "security" within the meaning of the Act.[3] Becker and the SIA then brought suit in the district court, which held the Board's determination to be invalid.[4] The Board appealed, and we reverse.
 
 I. FACTS
 
 2
 "Commercial paper" refers to prime quality, negotiable promissory notes bearing very short maturities--generally 30 to 90 days.[5] Large, financially strong corporations use commercial paper to obtain funds for current needs. Commercial paper is sold, in denominations averaging one million dollars or more, to large, sophisticated purchasers--money market mutual funds, bank trust departments, insurance companies and pension funds.[6]
 
 
 3
 Bankers Trust began placing third party commercial paper in 1978.[7] Its issuers had the highest rating from at least one of the rating services for commercial paper issuers; its customers were part of the bank's established base of institutional investors, who regularly purchase short term instruments from the bank. The bank offered to act as financial adviser to issuers of paper sold by the bank, and to extend credit to them, though for only a small portion of the unsold amount of the issue. It did not commit itself to purchase unsold paper, but it did purchase in the secondary market commercial paper of issuers for which it had acted. Bankers Trust was the first commercial bank to enter the commercial paper market in competition with the investment banks; other commercial banks awaited the outcome of subsequent legal proceedings.
 
 
 4
 Becker and the SIA requested the staff of the Federal Reserve Board to review the legality of Bankers Trust's activities. The Board's general counsel, after extensive discussion with Becker, SIA, Bankers Trust and the SEC, issued an opinion declaring that commercial banks may lawfully act as agent for the issuer in the sale of commercial paper, "provided that the sales ... are limited to purchasers to whom commercial banks normally sell participations in loans."[8] Becker and the SIA then requested the Federal Reserve Board to review the decision of its general counsel and to proscribe the commercial paper activities of member banks. After considering submissions by interested parties and conducting an on-site investigation of Bankers Trust's activities, the Board ruled that Bankers Trust's participation in the commercial paper market did not violate the Glass-Steagall Act or contravene public policy.[9]
 
 
 5
 In a carefully reasoned opinion the Board first concluded that there was no indication in the language or legislative history of the Glass-Steagall Act that Congress considered commercial paper to be a "security," in which banks were forbidden to deal.[10] The Board noted that banks had traditionally traded in commercial paper, and that the Act had been intended to strengthen banks in the exercise of traditional banking functions. The Board then turned to a "functional" analysis of the statutory terms, and concluded that, because commercial paper embodies short-term loans from a few sophisticated lenders to financially strong borrowers, it resembled a loan rather than a security for the purpose of the Glass-Steagall Act.[11] Because the Board ruled that commercial paper was not a "security," it did not reach the issue whether Bankers Trust was "issuing, underwriting, selling, or distributing" securities within the meaning of the Glass-Steagall Act.[12]
 
 
 6
 Subsequently, the Board issued guidelines to ensure that sale of third party commercial paper did not give rise to "unsafe or unsound practices."[13] These guidelines permitted banks to sell only prime quality third party commercial paper with maturity of nine months or less and in denominations of over $100,000. Banks could sell only to "financially sophisticated customers," and were forbidden to advertise to the general public. Sales to the bank's fiduciary accounts, parent holding companies and nonbank affiliates were also forbidden. Moreover, banks were required to maintain credit analyses of issuers, to limit the amount of paper sold for any issuer, and to maintain detailed records of sales, purchases and lines of credit extended. Finally, various disclosure requirements were imposed.
 
 
 7
 SIA and Becker sought review in the district court of the Board's ruling that commercial paper was not a "security." That court concluded that the Act's "plain language" barred commercial banks from trading in commercial paper.[14] It also found that the "broad framework" of the Act evinced Congress' intent to institute a sweeping prohibition of commercial banks' engaging in investment banking activities.[15] Finally, in response to the Board's "functional" analysis of commercial paper, the court averred that "[o]ne factor ... compels the conclusion that the commercial paper at issue here is [a security], and that crucial aspect is the role of Bankers Trust in the transaction."[16] For these reasons, the district court issued a declaratory judgment that the Board's ruling was contrary to law.[17]
 
 
 8
 We reverse. The district court gave insufficient weight to the expertise of the Federal Reserve Board--as the agency responsible for administering the nation's banking system--in interpreting the provisions of the Glass-Steagall Act. Moreover, the language of the Act, its legislative history and the policies underlying it all support the Board's conclusions that commercial paper is not a "security" under the Act. We discuss each of these findings in turn.
 
 II. STANDARD OF REVIEW
 
 9
 The Supreme Court recently had occasion again to delineate the standard to be applied in the review of an agency's interpretation of a statute which it is charged to implement. The task of the reviewing court is "not to interpret the statute as it [thinks] best but rather the narrower inquiry into whether the [agency's] construction was 'sufficiently reasonable' to be accepted by a reviewing court.... To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."[18]
 
 
 10
 In particular, the Board's ruling in the present case warrants deference for a number of reasons. First, the Board is "the type of agency to which deference should presumptively be afforded" because of the scope of its authority. Congress has vested the Board with "primary and substantial responsibility for administering" federal regulation of the national banking system.[19] The Board exercises "general supervisory" powers over member banks,[20] and is responsible to bring enforcement actions to prevent member banks from engaging in "unsafe or unsound" banking practices.[21] The Board thus formulates national banking policy, and, in implementing this policy, exercises broad rulemaking and adjudicative powers.
 
 
 11
 Second, deference to the Board's conclusions is warranted by its expert knowledge of commercial banking. "Not only because Congress has committed the [Federal Reserve] [S]ystem's operation to [the Board's] hands, but also because the system itself is a highly specialized and technical one, requiring expert and coordinated management in all of its phases, ... their judgment should be conclusive upon any matter which ... is open to reasonable difference of opinion. Their specialized experience gives them an advantage judges cannot possibly have ... in ascertaining the meaning Congress had in mind in prescribing the standards by which they should administer [the system]."[22]
 
 
 12
 Third, deference to an agency's construction of the statute is called for because the agency's decision applies general, undefined statutory terms--"notes and securities"--to particular facts. While the Glass-Steagall Act contains a sweeping prohibition of commercial banks' trading in "securities," that term is, of course, not self-defining.[23] Moreover, we cannot assume that Congress intended the term to comprise a set of rigid and unchanging categories. Rather, such statutory drafting "leave[s] the agency with the task of evolving definitions on a case-by-case basis."[24] The regulatory structure of the banking laws must be permitted to adapt to the changing financial needs of our economy.[25] Congress has delegated to the Federal Reserve Board, rather than to this court, the complex task of applying the Act's general proscriptions to current business reality. We must therefore defer to the Board's interpretation of the statute if that interpretation is reasonable.
 
 
 13
 Finally, "the thoroughness evident in the consideration [of an agency's interpretation of a statute], the validity of its reasoning, [and] its consistency with earlier and later pronouncements" are factors that bear upon the amount of deference to be given to an agency's ruling.[26] In this instance, the agency's interpretation of the statute is based on a thorough and expert review of the relevant legal and policy considerations as well as of the facts of this case. The Board conducted an extensive inquiry into the operation of Bankers Trust commercial paper operations and the function of the commercial paper market; it clearly set forth its findings, conclusions, and bases for its reasoning.[27] And the Board's conclusion is consistent with prior decisions, including some roughly contemporaneous with the passage of the Glass-Steagall Act.[28]
 
 
 14
 For these reasons, which we have considered in prior opinions and which may frequently be found of use in evaluating administrative agency decisions, we should hesitate to overturn the Board's decision as long as that decision is a reasonable interpretation of the Glass-Steagall Act. And, as will appear below, the decision was reasonable. We do not, however, rest merely on the deference to the conclusions of the Federal Reserve Board. "[T]o accord deference is not to abdicate our duty to construe the statute, for 'the courts are the final authorities and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' "[29] We therefore turn to an analysis of the application of the Glass-Steagall Act to the present case.
 
 III. APPLICATION OF THE GLASS-STEAGALL ACT
 
 15
 Taking account of appropriate deference to the Board's expertise and administrative responsibility, we find that its ruling and the reasoning which supports it are essentially correct. An inquiry into the language and legislative history of the statute, and the policies underlying it, supports the Board's conclusion that the commercial paper marketed by Bankers Trust is not a "security" within the Glass-Steagall Act.
 
 A. Background
 
 16
 Congress passed the Glass-Steagall Act in 1933, in response to what it perceived to be the abuses which resulted from the involvement of commercial banks in securities underwriting. Congress considered that commercial banks, by underwriting stocks, had fueled the rampant speculation that preceded the Great Depression. Congress' principal concern in amending the banking laws, however, was to protect the solvency and integrity of the banks themselves.[30]
 
 
 17
 Stock underwriting by commercial banks undermined bank solvency in a number of ways. Most directly, commercial banks that engaged in underwriting tied up depositors' funds in the purchase of unsound or speculative securities. These investments placed commercial deposits at risk.[31] The promotional pressures exerted by underwriting activities also threatened bank solvency. To augment their commissions from securities sales, commercial banks used their credit facilities to lend to purchasers of securities.[32] Banks were also tempted to make unsound loans to client-issuers, because these loans might improve the balance sheet of these enterprises and thereby make their securities more marketable. When speculative ventures failed, these loans to purchasers and issuers were often not repaid, undermining bank solvency and depositor confidence in the banks.[33]
 
 
 18
 In addition to inducing commercial banks to purchase unsound securities and to make unsound loans, banks' participation in the securities market had more indirect effects on bank solvency. Banks' association with speculative securities ventures undermine the confidence of bank depositors in the stability of the banks.[34] Moreover, banks which underwrote stock issues could not be relied upon to give prudent and disinterested investment advice to their depositors, for they naturally had an incentive to urge depositors to purchase shares of the issues the bank was underwriting.[35] Finally, these banks would also "dump" excess issues of unmarketable securities on their own trust departments.[36]
 
 
 19
 Congress passed the Glass-Steagall Act to correct these abuses. The Act is a prophylactic measure designed to prevent commercial banks from being exposed to the dangers which inevitably followed upon their participation in investment banking. "Congress acted to keep commercial banks out of the investment banking business largely because it believed that the promotional incentives of investment banking and the investment banker's pecuniary stake in the success of particular investment opportunities was destructive of prudent and disinterested commercial banking and of public confidence in the commercial banking system."[37]
 
 B. Statutory language
 
 20
 Congress accomplished the separation of commercial and investment banking in sections 16 and 21 of the Glass-Steagall Act. We first ask whether the language of these sections clearly evinces a congressional determination to prohibit the activities in which Bankers Trust has engaged; if so, our inquiry necessarily comes to an end.[38]
 
 
 21
 Section 16 provides that a bank "shall not underwrite any issue of securities or stock" and shall not "purchase ... for its own account ... any shares of stock of any corporation."[39] We can find nothing in the language of this section that explicitly articulates a congressional intent to bar commercial banks from trading in commercial paper. The terms "securities" and "stock" are not defined by the Act; section 16 in no way refers explicitly to notes, the generic financial term which Congress might have used to encompass commercial paper.[40] Indeed, banks are authorized to "discount and negotiate promissory notes, drafts, bills of exchange, and other evidences of debt ...."[41] It is clear, then, that section 16 does not prohibit banks from selling or underwriting all notes, but only "securities or stock"; and the section does not indicate whether the commercial paper at issue in this case is included within that statutory prohibition.
 
 
 22
 We turn then to section 21 of the Act, which forbids banks from underwriting "stocks, bonds, debentures, notes, or other securities ...."[42] Although this statutory provision explicitly refers to "notes," that term is susceptible of at least two interpretations. First, it may refer to a specific type of long-term debt security, one that closely resembles a bond or debenture but is of shorter maturity.[43] A note in this sense, like a bond or a debenture, is issued under an indenture agreement to raise money available for an extended period of time as part of the corporation's capital structure. An investment note differs from these other instruments in that it matures more quickly--in a few, rather than twenty or more, years.
 
 
 23
 Second, the term "notes" is sometimes used generically to refer to any promissory instrument regardless of maturity or negotiability.[44] In this sense, commercial paper may also be referred to as a promissory "note." Such a note differs sharply from an investment "note": commercial paper is used to obtain short-term credit for current transactions, rather than capital funds for long-term projects. Its maturity generally ranges from one to two months, and rarely exceeds nine months.[45]
 
 
 24
 The language of section 21 suggests that Congress intended only to prohibit the marketing of investment notes--i.e., that it intended to use "notes" in its more specific meaning. Each of the terms listed by Congress--"stocks," "bonds," "debentures" and "notes"--refers to a specific type of longterm investment security.[46] In contrast, "notes" in the more general sense would also include financial instruments, such as commercial paper, which have little in common with these long-term investment securities.[47] Moreover, "notes" used in its more general sense would include debt instruments such as bonds and debentures; the explicit statutory reference to the latter would then be redundant.[48] For these reasons, specific inclusion of the terms "stocks," "bonds," and "debentures" suggests that the narrower meaning of the term "notes" was intended. We conclude that the context in which the term "notes" is used strongly implies Congress' intent not to include commercial paper within the sweep of the Act's prohibition.
 
 
 25
 Both section 16 and section 21 thus demarcate a fundamental division between notes which represent commercial banking transactions--transactions which are, of course, permitted under the Act--and securities, such as investment notes, which commercial banks are prohibited from underwriting. Section 16 indicates this distinction by authorizing commercial banks to negotiate "promissory notes," while forbidding banks to negotiate "securities or stocks." Section 21 makes the distinction by barring banks from trading in specified instruments for raising capital as part of the permanent financial structure of a corporation--stocks, bonds, debentures and notes--while implicitly permitting transactions in other types of debt instruments. And the language of these sections, while not conclusive, strongly suggests that sale of commercial paper should be treated as a "loan" rather than a sale of securities for the purposes of the Act.
 
 C. Legislative history
 
 26
 The distinction between commercial loans and securities emerges as well from an analysis of the legislative history. Throughout its debates on the causes of the imperiled state of the banking industry, Congress nowhere considered the banks' activity in the commercial paper market as contributing to their difficulties.[49] The commercial paper market was simply not part of the problem to which the Glass-Steagall Act was addressed.[50] Rather, Congress focused its attention on the commercial banks' participation in "speculative" securities markets: their extensive underwriting of long-term holdings of high risk stocks and bonds.
 
 
 27
 For example, the Senate Report on the Act notes that "[t]he outstanding development in the commercial banking system during the prepanic period was the appearance of excessive security loans, and of over-investment in securities .... [A] very fruitful cause of bank failures ... has been the fact that the funds of various institutions have been so extensively 'tied up' in long-term investments."[51] Congress condemned "the excessive use of bank credit in making loans for the purpose of stock speculation ...."[52] In short, the purpose of the Act was to reverse "a loose banking policy which had turned from the making of loans on commercial paper to the making of loans on security."[53]
 
 
 28
 The distinction between bank participation in the securities and in the commercial paper markets is also illustrated in Congress' treatment of section 2(b) of the McFadden Act.[54] Section 2(b) limited the amounts of "investment securities" national banks could hold.[55] It is clear, however, that commercial paper was not considered an "investment security" under the McFadden Act: banks were left free to trade in commercial paper without restriction.[56] It is significant, therefore, that Congress preserved the provisions of the McFadden Act when it passed the Glass-Steagall Act six years later.[57] The legislative history of the Glass-Steagall Act provides no indication that Congress intended to change the McFadden Act's definition of "investment security."[58] Moreover, it is unlikely that Congress would consider commercial paper to be a "security" but not an "investment security."[59] Thus, Congress' incorporation of the McFadden Act into the revised banking laws, like other aspects of the legislative history, indicates an intent to continue to leave banks free to deal in commercial paper.
 
 D. The Analogy to the Securities Laws
 
 29
 Plaintiffs suggest that we may infer Congress' intent from its use of the term "security" in two contemporaneous statutes--the Securities Act of 1933 and the Securities Exchange Act of 1934. Both acts define "security" to include "any note."[60] There is no reason, however, to assume that Congress intended that term to bear the same meaning in these different statutory contexts. Congress enacted the Glass-Steagall Act primarily to protect bank depositors.[61] By contrast, "[t]he primary purpose of the [Securities] Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors."[62]
 
 
 30
 Therefore, although Congress used the term "securities" in both the Glass-Steagall and the Securities Acts, different interpretations of "securities" may follow upon the differing regulatory purposes behind the Acts.[63] "Because securities transactions are economic in character Congress intended the application of [the Securities Acts] to turn on the economic realities underlying a transaction ...."[64] Similarly, the Court has defined the term "securities" in the Glass-Steagall Act by analyzing the economic policy behind the Act--to protect bank depositors from the hazards which ensue when commercial banks enter the investment banking business.[65] In short, the Glass-Steagall Act uses the term "security" to fence off investment banking activities from commercial banks; the securities laws use the term to define the capital markets whose economic functioning is to be regulated by the securities laws. Clearly, the scope of the term may differ in these differing contexts. We must assign the term "security" a different meaning in the Glass-Steagall and the Securities Acts if a different interpretation is called for by the respective policies of those Acts.[66]
 
 
 31
 The Supreme Court recently reaffirmed this approach to the Securities Acts in Marine Bank v. Weaver.[67] "The [Securities Exchange] Act was adopted to restore investors' confidence in the financial markets .... We have repeatedly held that the test [of whether an instrument is a "security"] 'is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.' "[68] Therefore, "[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."[69]
 
 
 32
 In deciding that a certificate of deposit was not a security, Marine Bank noted two facets of the economics of these certificates: first, holders receive a fixed rate of interest rather than dividends based on profits; second, "[i]t is unnecessary to subject issuers of bank certificates of deposit to liability under ... the federal securities laws since the holders of bank certificates of deposit are abundantly protected under federal banking laws."[70] In short, the Court focused on the potential economic gains and losses of the investors, who are the intended beneficiaries of federal securities regulation, in deciding whether the purposes of that regulation would be furthered by its application to the instrument in question. A different focus of analysis is called for under the Glass-Steagall Act, which aims at protecting the integrity of banks and the financial resources of depositors rather than investors.
 
 
 33
 We conclude that the meaning of the term "securities" under the securities laws is of little immediate relevance to the problem before us; rather, the example of these laws suggests the need for a careful economic analysis of the commercial paper market itself.
 
 E. Functional Analysis of Commercial Paper
 
 34
 The language and the legislative history of the Glass-Steagall Act strongly suggest that commercial paper should be viewed as a loan rather than as a "security" for the purposes of the Act. However, as we have seen, neither the language nor direct evidence from the legislative history is decisive of the question before us. There is no foolproof formula by which we can decide whether the commercial paper marketed by Bankers Trust constitutes a "security." Rather, as the Board observed,
 
 
 35
 a broad generic or literal reading of the term "security" would likely encompass a number of instruments that banks routinely deal with in the course of their business and would, consequently, be contrary to the basic purpose of the Act. On the other hand, a highly technical or formalistic approach might permit evasions of the mandate of Congress.[71]
 
 
 36
 Because neither the literal language of the statute nor other expressions of congressional intent available to us directly indicate whether commercial paper is a "security," it is necessary to conduct a "functional analysis" of Bankers Trust's commercial paper to resolve this question. The problem becomes whether classifying commercial paper as a "security" would further the policies of the Act. As the Board phrased this inquiry:[I]f a particular kind of financial instrument evidences a transaction that is more functionally similar to a traditional commercial banking operation than to an investment transaction, then fidelity to the purposes of the Act would dictate that the instrument should not be viewed as a security.[72]
 
 
 37
 In adopting this functional analysis, the Board followed the Supreme Court's reasoning in its recent cases construing the Glass-Steagall Act. In Investment Company Institute v. Camp (ICI I) the Court noted that
 
 
 38
 Congress was concerned that commercial banks in general and member banks of the Federal Reserve System in particular had both aggravated and been damaged by stock market decline partly because of their direct and indirect involvement in the trading and ownership of speculative securities. The Glass-Steagall Act reflected a determination that policies ... which might otherwise support the entry of commercial banks into the investment banking business were outweighed by the "hazards" and "financial dangers" that arise when commercial banks engage in the activities proscribed by the Act.[73]
 
 
 39
 Thus, if confronted with a banking practice which involves the sale of securities and for that reason threatens the "hazards" at which the Act is aimed, neither the Federal Reserve Board nor this court is free to "balance" these hazards against the perceived benefits of the proposed practice. If the practice does not threaten to cause these hazards, however, we need undertake no such balancing. Rather, we effectuate the will of Congress by concluding that the proposed banking practice is not within the scope of the statutory proscription.
 
 
 40
 For example, in ICI I the Court found that the bank's sale of participations in a bank-sponsored mutual fund posed the dangers that the Glass-Steagall Act was designed to prevent; the Court concluded that these participations were securities within the meaning of the Act.[74] Once these participations were found under this functional analysis to be "securities," the "literal language" of the Act prohibited sale by the bank.[75]
 
 
 41
 The Federal Reserve Board, in resolving the present case, therefore correctly focused on whether the commercial paper marketed by Bankers Trust functioned economically as a loan or as a security. Only if commercial paper displayed the economic characteristics of a "security" would the marketing of commercial paper by Bankers Trust cause the hazards the Act was designed to prevent. The Board concluded that, in all relevant respects, the commercial paper had the economic characteristics of a loan.[76] We agree.
 
 
 42
 It is useful to review the traditional lending functions of commercial banks. The commercial lender extends short-term credit to businesses to finance immediate needs for working capital.[77] To assure itself of timely repayment, the commercial bank carefully evaluates the credit-worthiness of the borrower and the borrower's representations as to the use of funds. In recent years, the lender has characteristically been either a bank or a syndicate of lenders, which may include banks and lending institutions such as credit or mortgage companies.[78]
 
 
 43
 We find that the commercial paper at issue here has the economic characteristics of a traditional loan. Purchase of commercial paper, like lending by a commercial bank, represents a very reliable means by which the lender may earn a return on excess cash over a short period of time. Several features of the commercial paper market are salient in this respect.
 
 
 44
 First, the default rate on commercial paper is extremely low: only highly solvent corporations, with the best possible bond ratings, are able to market commercial paper. Indeed, the default rate on commercial paper is much lower than that on ordinary commercial loans made to high-grade commercial customers.[79]
 
 
 45
 Second, Bankers Trust commercial paper, like most commercial loans, is of very short maturity: it is generally redeemable at face value within 30 to 90 days.[80] Short maturity not only makes commercial paper a very liquid investment; it also reduces risk, because the financially strong corporations which can issue commercial paper are unlikely to deteriorate over the short period during which purchasers must hold the paper.
 
 
 46
 Third, because commercial paper is sold by Bankers Trust in denominations averaging one million dollars or more,[81] this paper is placed only with sophisticated purchasers--large institutions such as pension funds, money market mutual funds, insurance companies and nonfinancial corporations with large amounts of idle cash.[82] These purchasers, like commercial banks, are well able to evaluate the riskiness of the investments by verifying representations about the issuers. Three independent rating services also conduct thorough periodic investigations of issuers' financial condition.[83]
 
 
 47
 For all these reasons, investment in commercial paper, far from resembling securities speculation, is less risky even than banks' ordinary commercial lending.[84] The key difference between the commercial paper sold by Bankers Trust and the traditional lending of commercial banks is that capital is lent by other investors rather than by the bank.[85] In the traditional loan transaction, the commercial bank purchases commercial paper; in the present case, the bank acts as agent in the sale of commercial paper. The bank is simply on the other side of the transaction. The question which faced the Board is whether commercial paper should be considered a "security" merely because the bank acts as the seller rather than the purchaser of the commercial paper--i.e., whether the role of the bank in and of itself makes the transaction one prohibited by the Glass-Steagall Act.[86]
 
 
 48
 We agree with the Board that Bankers Trust may sell as well as purchase commercial paper. The bank's role as seller does not threaten the bank with those dangers which the Glass-Steagall Act was designed to prevent. Because commercial paper is like a loan rather than a security, marketing of commercial paper by the bank does not have the same economic impact on the bank as would marketing of securities.
 
 
 49
 This is confirmed by an analysis of the dangers which the Glass-Steagall Act was designed to prevent.[87] One such danger was that bank underwriting of securities may "tie up" depositors' funds in speculative securities. Bankers Trust's sale of commercial paper does not create this danger because of the features of commercial paper already noted. First, the bank acts simply as an agent in the sale of commercial paper; it does not agree to purchase the paper on its own account--i.e., with the funds of depositors.[88] Second, commercial paper is of prime quality, sold only by corporations with well-established credit ratings: commercial paper is not a "speculative" holding.[89] Third, commercial paper is held by the lender only for 30 to 90 days:[90] the lender may readily convert his holdings to cash and does not bear the risk of long-term fluctuations in the value of the enterprise.
 
 
 50
 The other set of dangers addressed by the Glass-Steagall Act comprises the conflicts of interest that arise when a commercial bank underwrites securities.[91] Again, Bankers Trust does not face these conflicts.
 
 
 51
 First, the bank cannot use its credit facilities in order to facilitate sale of its commercial paper. Because the interest on a commercial loan is higher than that paid out on commercial paper, a purchaser of commercial paper would not use a commercial loan to finance its purchases.[92] Conversely, the bank is under no incentive to advance unsound loans to shore up its issuers of commercial paper, because these issuers must be, by the nature of the commercial paper market, financially sound.[93]
 
 
 52
 Second, Bankers Trust is not in a position to abuse its reputation for prudence, or give unreliable financial advice to its depositors, in order to promote the sale of commercial paper. Commercial paper is purchased only by large sophisticated buyers who are capable themselves of evaluating the wisdom of their investment.[94] Moreover, commercial paper is very low-risk, and is issued only by very solvent corporations about whose financial prospects information is widely available.[95] It is inconceivable that a commercial bank such as Bankers Trust could, under these conditions, seek improperly to influence potential purchasers of commercial paper.[96]
 
 
 53
 Finally, the bank's reputation for prudence will not suffer by its association with the issue of commercial paper. Commercial paper is a highly sound short-term investment. And even if a commercial paper issuer were to default, the sophisticated purchasers of commercial paper will understand that this paper is not backed by the guarantees on commercial bank deposits.
 
 
 54
 The Board's "functional analysis" leads inexorably to the conclusion that Bankers Trust's commercial paper is not a "security" within the meaning of the Glass-Steagall Act. Transactions in commercial paper display the key economic characteristics of a commercial bank loan; and, because of these characteristics, Bankers Trust's dealings in commercial paper pose none of the hazards the Glass-Steagall Act was designed to prevent.
 
 IV. CONCLUSION
 
 55
 We thus agree with the Board that Bankers Trust may continue to deal in commercial paper without violating the Glass-Steagall Act. The commercial paper it markets is not a "security" within the prohibitions of the Act. Moreover, our reasoning applies to other commercial paper which falls within the Board's guidelines--i.e., prime quality commercial paper, of maturity less than nine months, sold in denominations of over $100,000 to financially sophisticated customers rather than to the general public.[97] Commercial banks which deal in this paper are not subject to the risks which the Glass-Steagall Act was designed to prevent. We hold therefore that commercial banks may sell third party commercial paper provided that they comply with the Board's guidelines.
 
 
 56
 It is appropriate to note, however, the limits to this holding. It is conceivable that another type of commercial paper--e.g., of smaller denominations, or issued to the general public--might be a "security" under the Glass-Steagall Act. Commercial bank involvement in the market for such commercial paper may well undermine bank solvency or create unavoidable conflicts of interest. Moreover, the present case does not require us to decide whether Bankers Trust is engaged in "underwriting." A commercial bank is permitted to underwrite commercial paper so long as commercial paper is not a "security." If other species of commercial paper prove to be a "security," however, the issue what constituted "underwriting" of commercial paper would then have to be decided.
 
 
 57
 Our opinion does not touch directly on other species of commercial paper. As the commercial paper market and banking practices continue to evolve, the Board will be called upon to determine in varying fact situations the scope of activities that Congress intended to permit banks to undertake. But these hypothetical situations are irrelevant to the problem before us. Because the Board correctly applied its functional analysis to the instant case, the judgment of the district court is
 
 
 58
 Reversed.
 
 ROBB, Senior Circuit Judge, dissenting:
 
 59
 I dissent. In my opinion the majority's holding contravenes the fundamental policy of the Glass-Steagall Act. That Act seeks to insulate commercial banking from the hazards inherent in investment banking by mandating a complete separation of those two functions. The majority decision violates this separation of functions by finding no difference under the Act between a lender in a commercial loan transaction and a seller in the sale of third-party commercial paper.
 
 
 60
 Although offering various justifications, the majority ultimately rests its holding on a "functional analysis" of Bankers Trust's third-party commercial paper sales. In its functional analysis, the majority dismisses the difference between the bank's role as "purchaser" in a commercial loan transaction and its role as "seller" in a third-party commercial paper transaction as a case of the bank "simply [being] on the other side of the transaction." Ante at 150. This distinction, however, is determinative under the Act. Through the Act Congress sought a complete separation of commercial banking from investment banking. See Investment Co. Institute v. Camp, 401 U.S. 617, 629, 632, 91 S.Ct. 1091, 1098, 1099, 28 L.Ed.2d 367 (1971). See also Board of Governors of Federal Reserve System v. Investment Co. Institute, 450 U.S. 46, 62, 101 S.Ct. 973, 984, 67 L.Ed.2d 36 (1981). The critical distinction between commercial banking and investment banking is the bank's role in the transaction.
 
 
 61
 When a bank lends money it is the investor. Following a thorough credit analysis of the potential borrower, the bank decides whether to approve the loan. A loan that the bank has approved and funded constitutes an asset of the bank for which the bank has placed its funds at risk. The bank's generation of income and collection of principal are dependent on the wisdom of the bank's credit decision, the adequacy of the loan provisions, and the bank's perseverance in collecting the loan.
 
 
 62
 In contrast, when a bank markets third-party commercial paper, it is the seller, not the investor. As seller, the bank has less incentive to conduct a thorough credit analysis of the commercial paper issuer because the bank, unlike an investor, does not place its funds at risk. The bank earns its fee upon closing the sale of the commercial paper. Once the sale is complete, the bank has no direct financial interest in the issuer's ability to meet its commercial paper obligations.
 
 
 63
 Ignoring the differences in the bank's roles as lender and as seller, the majority characterizes commercial loans as "short-term" transactions and then avers that selling commercial paper is no different than making a commercial loan because both transactions have short maturities. Ante at 143-144. This analysis fails for two reasons. First, any interpretation of the Act must focus on the bank's role in the transaction with a view to maintaining the Act's separation of banking functions. The majority's focus on maturities provides no help in determining whether the bank's role in the transaction violates the Act. Second, the basic premise of the majority's analysis is incorrect. Commercial lending is not limited to short-term loans. Longer maturity loans for the acquisition of fixed assets and for permanent increases in working capital are important commercial lending services which the majority conveniently ignores. See D. Hayes, Bank Lending Policies 89, 107, 109 (2d ed. 1977); G. Munn, Encyclopedia of Banking and Finance 892 (7th ed. 1973). See generally Business Loans of American Commercial Banks chs. 7, 9 (B. Beckhart ed. 1959).
 
 
 64
 Similarly, an analogy between commercial paper sales and commercial loans, based on low default rates and the sophistication of the investors, ante at 144, is not helpful. Relying on these factors, a bank could transform "transactions unquestionably at the heart of the securities industry into permissible activity for commercial depository banks." A.G. Becker Inc. v. Board of Governors of the Federal Reserve System, 519 F.Supp. 602, 615 (D.D.C.1981).
 
 
 65
 The majority says that analysis of the hazards of mixing commercial and investment banking "confirms" the result reached through its functional analysis. I reach the opposite conclusion. In Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), the Supreme Court lists several hazards that arise when commercial banks become peddlers of securities. First, commercial banks may suffer losses from imprudent security investments. Id. at 630, 91 S.Ct. at 1098. Second, "the bank's salesman's interest might impair its ability to function as an impartial source of credit." Id. at 631, 91 S.Ct. at 1099. Third, commercial banks may lose customer good will if their depositors suffer losses on investments made in reliance on the bank's involvement in the transaction. Id. Fourth, commercial banks may use their reputation for prudence to further their securities sales and subject that reputation to the risks necessarily incident to the investment banking business. Id. at 632, 91 S.Ct. at 1099. Finally, the bank's promotional interests could conflict with its commercial banker obligation to render disinterested investment advice. Id. at 633, 91 S.Ct. at 1100.
 
 
 66
 The majority makes short work of the hazards discussed in the Camp decision. Those hazards, in the majority's view, are irrelevant here because commercial paper is a "prime quality", "very low-risk" investment, issued by "financially sound" issuers, and sold to "sophisticated" investors. Ante at 150-151. The majority's self-fulfilling analysis misses the point. "Prime quality" and "very low-risk" are characterizations that are justified only after an investment has been terminated without any investor loss. The drafters of the Act were certainly more wary of such characterizations in 1933 than the majority is today. The Act has no provision permitting bank sales of securities which are "prime quality" or "very low-risk".
 
 
 67
 To determine whether the bank's sale of third-party commercial paper involves the hazards that the Act seeks to prevent, we must take the perspective of the Act's drafters. The recent Penn Central experience provides such a perspective. See generally Staff of Securities & Exchange Commission, 92d Cong., 2d Sess., Report to Special Subcomm. on Investigations of the House Comm. on Interstate and Foreign Commerce, The Financial Collapse of the Penn Central Company (Subcomm. Print 1972) [hereinafter cited as Penn Central Report ]. As a consequence of its bankruptcy on June 21, 1970 the Penn Central Transportation Company defaulted on $82.5 million in commercial paper. Id. at 1. Goldman, Sachs & Co., the nation's largest commercial paper dealer, had sold the commercial paper during the seven months preceding the bankruptcy. Id. at 290. The National Credit Office, a wholly owned subsidiary of Dun & Bradstreet, Inc., had given Penn Central's commercial paper its highest rating, "prime", until June 1, 1970. Id. at 283. The investors, whom Goldman, Sachs & Co. described as "sophisticated" and "capable of making their own investment decisions," had purchased Penn Central commercial paper in $100,000 denominations. Id. at 290.
 
 
 68
 A review of the Camp warnings in light of the Penn Central experience presents a picture very different from that which the majority draws. First, although Bankers Trust makes no commitment to purchase unsold commercial paper, it makes clear in its promotional letter to commercial paper issuers that such purchases are within the ambit of its investment services.However, in those rare occasions in which we would be unable to satisfy all of [the issuer's] requirements through the placement of paper with investors, we may, from time-to-time and without prior commitment, lend [the issuer] money at the commercial paper rate and take back a commercial paper note.
 
 
 69
 (J.A. at 61). See also J.A. at 27, 50. The majority states that bank purchases of commercial paper would not present a problem because commercial paper is "prime quality, [is] sold by corporations with well-established credit ratings," and is a short-term investment. Ante at 150. Yet a bank's purchase of Penn Central's commercial paper, which fit the majority's criteria just three weeks before it became worthless, would have been a perfect example of the hazard of "imprudent investment" that the Act seeks to prevent.
 
 
 70
 Second, the majority states that commercial paper issuers are "financially sound" companies and, therefore, have no need for commercial loans to strengthen their financial position. Ante at 150-151. However, as the Penn Central case demonstrates, commercial paper issuers are not exempt from financial difficulties. A bank's interests in handling the issuer's commercial paper sales and in protecting the bank's reputation for sound financial decisionmaking could "distort its credit decisions or lead to unsound loans" to issuers for whom the bank regularly sells commercial paper. Investment Co. Institute v. Camp, 401 U.S. at 637, 91 S.Ct. at 1102.
 
 
 71
 The third hazard discussed in the Camp decision arises when a bank sells third-party commercial paper under any circumstances less idealistic than those which the majority envisions. Bank depositors who are financially able to purchase commercial paper in large denominations are likely to be among the bank's most important and influential clientele. Loss of their good will as a result of losses on investments which the bank recommended and sold could be detrimental to the bank's commercial operations.
 
 
 72
 Finally, the majority makes the indisputable statement that when a bank sells "very low-risk" commercial paper of "very solvent" corporations to "large, sophisticated" investors the bank is not in a position to abuse its reputation for prudence or to give unreliable financial advice. Ante at 150. However, commercial paper sales that initially fit the majority's criteria may, before the investors are repaid, create hazards that the Act seeks to prevent.
 
 
 73
 Goldman, Sachs & Co. sold $5 million of the commercial paper of Penn Central, the nation's fourth largest corporation, to American Express Company, a sophisticated investor, on May 1, 1970. Penn Central Report at 286, 291. That sale, following several indications of major problems at Penn Central, id. at 279-86, and preceding the Company's collapse by just seven weeks, demonstrates the hazards present when there is a financial incentive to give unreliable advice. Had Bankers Trust been Penn Central's securities peddler, the association with Penn Central's collapse together with the resulting lawsuits which the bank would have had to defend would have severely damaged the bank's reputation for financial prudence. See Comment, The Commercial Paper Market and the Securities Acts, 39 U.Chi.L.Rev. 362, 378-79 nn. 112-13 (1972).
 
 
 74
 We must analyze the Act with the intent of its drafters as our guide. The Act was a "drastic step", Investment Co. Institute v. Camp, 401 U.S. at 629, 91 S.Ct. at 1098, taken during a bleak period in our country's banking history. Its drafters intended a complete separation of commercial banking from investment banking without regard to the likely "soundness" of the securities which a bank might sell. Senator Bulkley stated this uncompromising position at the time of the Act's passage: "If we want banking service to be strictly banking service, without the expectation of additional profits in selling something to customers, we must keep the banks out of the investment security business." Investment Co. Institute v. Camp, 401 U.S. at 634, 91 S.Ct. at 1100 (quoting 75 Cong.Rec. 9912 (1932) (remarks of Sen. Bulkley)). Permitting a bank to sell third-party commercial paper presents the same hazards that "Congress determined ... made it necessary to prohibit ... [investment banking] activity to commercial banks." Investment Co. Institute v. Camp, 401 U.S. at 636, 91 S.Ct. at 1101. As a result, we must look closely to determine whether the Act prohibits banks from selling third-party commercial paper.
 
 
 75
 Unlike the majority, I find the Act's language helpful in determining whether commercial paper is a "note" or "security". For our purposes the Act raises two issues. The first issue is whether commercial paper is an instrument with which the Act is concerned--"stocks, bonds, debentures, notes, or other securities," 12 U.S.C. Sec. 378(a)(1) (1976). The second issue is whether Bankers Trust is engaged in the "issuing, underwriting, selling, or distributing," id., activities which the Act prohibits.
 
 
 76
 The majority characterizes the terms "stocks", "bonds", "debentures", and "notes" as "specific type[s] of long-term investment securit[ies]." Ante at 143-144. The majority concludes that a broader definition of the term "notes" would be inappropriate because it would include instruments such as commercial paper "which have little in common with these long-term investment securities." Ante at 144. The majority's reliance on maturities to force a narrow meaning onto the terms of the Act is misplaced. The Supreme Court has interpreted the Act's terms broadly.
 
 
 77
 [N]othing in the phrasing of either Sec. 16 or Sec. 21 ... suggests a narrow reading of the word "securities." To the contrary, the breadth of the term is implicit in the fact that the antecedent statutory language encompasses not only equity securities but also securities representing debt.
 
 
 78
 Investment Co. Institute v. Camp, 401 U.S. at 635, 91 S.Ct. at 1101. See also Board of Governors of Federal Reserve System v. Investment Co. Institute, 450 U.S. at 65, 101 S.Ct. 986. The terms "stocks", "bonds", "debentures", and "notes" have broad meanings which encompass a multitude of different instruments. The term "other securities" further indicates the breadth of the Act's coverage; it catches any instruments which are not otherwise defined by the prior four terms. Taken as a group these five terms cover the spectrum of instruments which a corporation might seek to market. Relying "squarely on the language ... of the Glass-Steagall Act," Board of Governors of Federal Reserve System v. Investment Co. Institute, 450 U.S. at 65, 101 S.Ct. at 986. I would find that commercial paper is a type of instrument with which the Act is concerned.
 
 
 79
 Although analysis of the Act's terms and of the hazards with which the Act is concerned requires a finding that commercial paper is a "note or other security" under the Act, our inquiry is not complete. There remains the second issue of whether Bankers Trust's commercial paper sales is an activity which the Act prohibits. However, neither the Federal Reserve Board nor the District Court reached this second issue. A.G. Becker Inc. v. Board of Governors of Federal Reserve System, 519 F.Supp. 602, 616 n. 10 (D.D.C.1981). Therefore the second issue is not before us on this appeal.
 
 
 80
 I would affirm the District Court's finding that commercial paper is a "note or other security" under the Act, and would remand this case for the further determinations suggested in this dissent.
 
 
 
 [1]
 See 12 U.S.C. Secs. 321-339 (1976 & Supp. IV 1980)
 
 
 [2]
 Section 16 of the Act provides in pertinent part:
 The business of dealing in securities and stock by the association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock; Provided, That the association may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe.
 12 U.S.C. Sec. 24 Seventh (Supp. IV 1980).
 Section 21 provides that:
 [I]t shall be unlawful ... [f]or any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor ....
 12 U.S.C. Sec. 378(a)(1) (1976).
 
 
 [3]
 Federal Reserve System, Statement Regarding Petitions to Initiate Enforcement Action (26 Sept. 1980), Joint Appendix (J.A.) at 220 [hereinafter cited as Federal Reserve Statement]
 
 
 [4]
 A.G. Becker, Inc. v. Board of Governors, 519 F.Supp. 602 (D.D.C.1981)
 
 
 [5]
 See generally Hurley, The Commercial Paper Market, 63 FED.RES.BULL. 525 (1977); Comment, The Commercial Paper Market and the Securities Acts, 39 U.CHI.L.REV. 362 (1972)
 
 
 [6]
 See sources cited at supra note 5. See also infra p. 149
 
 
 [7]
 This description of Bankers Trust's activities relies upon Federal Reserve Statement, supra note 3, at 2-3, J.A. at 221-22. Appellees do not challenge the Board's factual findings as to Bankers Trust's participation in the commercial paper market
 
 
 [8]
 Legal Division, Board of Governors of the Federal Reserve System, Commercial Paper Activities of Commercial Banks: A Legal Analysis 21 (28 June 1979), J.A. at 168
 
 
 [9]
 Federal Reserve Statement, supra note 3
 
 
 [10]
 Id. at 6-17, J.A. at 225-36
 
 
 [11]
 Id. at 17-20, J.A. at 236-39. The Board also rejected the arguments that the definition of "security" in the Securities Act of 1933, or considerations of public policy, militated against permitting Bankers Trust's sale of third party commercial paper. Id. at 20-27, J.A. at 239-46
 
 
 [12]
 Id. at 24, J.A. at 243
 
 
 [13]
 Policy Statement Concerning the Sale of Third Party Commercial Paper by State Member Banks, 46 Fed.Reg. 29333, 29334-35 (26 May 1981) [hereinafter cited as Guidelines]
 
 
 [14]
 Becker, 519 F.Supp. at 612-13
 
 
 [15]
 Id. at 614-15
 
 
 [16]
 Id. at 615-16
 
 
 [17]
 Id. at 616. The district court confined its holding to the question of whether the commercial paper at issue was a "security." Like the Board, it did not reach the question whether Bankers Trust was "underwriting" securities in violation of the Glass-Steagall Act. See id. at 616 n. 10
 Moreover, the district court did not explicitly rule on the validity of the Board's guidelines. However, because the guidelines in essence describe Bankers Trust's activities, it would be difficult to reconcile those guidelines with the district court's holdings. Conversely, if we find that Bankers Trust has acted lawfully, the activities of other commercial banks in compliance with the guidelines would be lawful as well. See Part IV (Conclusion) infra.
 
 
 [18]
 Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (emphasis added) (citations omitted)
 
 
 [19]
 Compare Democratic Senatorial Campaign Comm., 454 U.S. at 39, 102 S.Ct. at 46
 
 
 [20]
 See 12 U.S.C. Sec. 248 (1976)
 
 
 [21]
 See 12 U.S.C. Sec. 1818(b) (Supp. IV 1980). See also 12 U.S.C. Sec. 501a (1976) (enforcement actions for violation of banking laws and regulations)
 
 
 [22]
 Board of Governors of the Federal Reserve System v. Agnew, 329 U.S. 441, 450, 67 S.Ct. 411, 415, 91 L.Ed. 408 (1947) (Rutledge, J., concurring). See Board of Governors of Federal Reserve System v. Investment Co. Inst., 450 U.S. 46, 56 n. 21, 101 S.Ct. 973, 981 n. 21, 67 L.Ed.2d 36 (1981) (citing Agnew) [hereinafter cited as ICI II ]
 
 
 [23]
 See infra p. 143
 
 
 [24]
 Puerto Rico v. Blumenthal, 642 F.2d 622, 635 (D.C.Cir.1980), cert. denied, 451 U.S. 983, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981); Chisholm v. FCC, 538 F.2d 349, 358 (D.C.Cir.), cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976)
 
 
 [25]
 Cf. M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 F.2d 1377, 1382 (9th Cir.1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (bank laws construed to permit "use of new ways of conducting the very old business of banking"). The current situation of the commercial paper market could not have been foreseen by Congress at the time the Glass-Steagall Act was passed: that market has changed drastically since the Depression. See infra note 85
 
 
 [26]
 Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (emphasis added). See Democratic Senatorial Campaign Comm., 454 U.S. at 39, 102 S.Ct. at 46 (citing Swift ); Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978) (same)
 
 
 [27]
 Federal Reserve Statement, supra note 3
 
 
 [28]
 For example, in 1933 the Board stated that commercial paper, defined as short-term paper issued for obtaining funds for current transactions and purchased by banks and corporations with temporarily idle funds, should not be considered an investment security. See Federal Securities Act: Hearing on H.R. 4314 before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 1st Sess. 180-81 (1933); Securities Act: Hearings on S. 875 Before the Senate Comm. on Banking and Currency, 73d Cong., 1st Sess. 120 (1933); Federal Reserve Statement, supra note 3, at 11, J.A. at 230
 The assumption that commercial paper is a loan rather than a security pervades current banking regulation. The Board has ruled that issuance of commercial paper by a bank holding company does not fall within section 20 of the Glass-Steagall Act, the analogous provision for those companies. See 12 C.F.R. Sec. 250.221(e) (1982). Under the rules of the Comptroller General's office, commercial paper holdings by banks are subject to the statutory limits on loans rather than investment securities. See 12 C.F.R. Sec. 7.1180 (1982) (interpreting 12 U.S.C. Sec. 84 (1976)); Federal Reserve Statement, supra note 3, at 11-12, J.A. at 230-31. And commercial paper is treated as a loan for bank call reports and bank examination by the Federal Reserve Board. Id.
 
 
 [29]
 Nat'l Ass'n of Recycling Inds., Inc. v. ICC, 660 F.2d 795, 799 (D.C.Cir.1981) (citations omitted)
 
 
 [30]
 SENATE COMM. ON BANKING AND CURRENCY, OPERATION OF THE NATIONAL AND FEDERAL RESERVE BANKING SYSTEMS, S.REP. NO. 77, 73d Cong., 1st Sess. 2-4, 6-13 (1933)
 
 
 [31]
 Id. at 9-10
 
 
 [32]
 See 75 CONG.REC. 9912 (1932) (remarks of Sen. Bulkley); Operation of the National and Federal Reserve Banking Systems: Hearings Pursuant to S.Res. 71 before a Subcomm. of the Senate Comm. on Banking and Currency, 71st Cong., 3d Sess. 87 (1931) (remarks of Chairman Glass) [hereinafter cited as Hearings]
 
 
 [33]
 75 CONG.REC. 9912 (1932) (remarks of Sen. Bulkley)
 
 
 [34]
 Id
 
 
 [35]
 Hearings, supra note 32, at 237
 
 
 [36]
 Id
 
 
 [37]
 Investment Co. Inst. v. Camp, 401 U.S. 617, 634, 91 S.Ct. 1091, 1100, 28 L.Ed.2d 367 (1971) [hereinafter cited as ICI I ]
 
 
 [38]
 E.g., Transamerica Mortgage Advisers, Inc. v. Lewis, 444 U.S. 11, 16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979)
 
 
 [39]
 12 U.S.C. Sec. 24 Seventh (Supp. IV 1980) (emphasis added). The Act allows for several exceptions; the one pertinent here is that for "investment securities." See infra pp. 145-146
 
 
 [40]
 See infra p. 143 & note 44
 
 
 [41]
 12 U.S.C. Sec. 24 Seventh (Supp. IV 1980)
 
 
 [42]
 12 U.S.C. Sec. 378(a)(1) (1976). If the language of either section 16 or section 21 must be interpreted to prohibit Bankers Trust's marketing of commercial paper, that interpretation of course governs. See generally ICI II, supra note 22, 450 U.S. at 62-65, 101 S.Ct. at 984-86
 
 
 [43]
 See, e.g., 1 A. DEWING, THE FINANCIAL POLICY OF CORPORATIONS 180 (4th ed. 1941); G. MUNN, ENCYCLOPEDIA OF BANKING AND FINANCE 132 (7th ed. 1973)
 
 
 [44]
 See, e.g., G. MUNN, supra note 37, at 698 (defining "note" as a "written promise ... to pay a certain sum of money to the ... payee")
 
 
 [45]
 See also infra p. 149 & note 80
 
 
 [46]
 "Stocks," of course, represent ownership interests in a corporation. "Bonds" are secured debt instruments, issued under a trust indenture agreement, that bear long-term maturities and are offered to the public in small denominations. "Debentures" differ from bonds only in that they are unsecured
 
 
 [47]
 See Third Nat'l Bank in Nashville v. IMPAC, Ltd., 432 U.S. 312, 322 & n. 16, 97 S.Ct. 2307, 2313 & n. 16, 53 L.Ed.2d 368 (1977) ("words grouped in a list should be given related meanings"); Am. Maritime Ass'n v. Stans, 485 F.2d 765, 768 (D.C.Cir.1973) (same). Cf. Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961) (statutory term "gathers meaning from the words around it")
 Similarly, under the familiar principle that where general words follow specific words in an enumeration, the general words are construed to embrace only items similar to those specifically enumerated, see, e.g., Harrison v. PPG Inds., Inc., 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980), the phrase "or other securities would include only financial instruments with the economic characteristics of those listed, see supra note 46, not commercial paper.
 The conclusion that commercial paper differs markedly from those instruments which Congress intended to prohibit commercial banks from underwriting depends ultimately upon an analysis of the relevant economic characteristics of these instruments, such as the characteristics noted in text. It is clear that commercial paper differs from the family of specific instruments listed in section 21 of the Act; we explain below the relevance of these differences to the policies which Congress intended the Act to advance. See infra parts IIIC (legislative history) and IIIE (functional analysis of the commercial paper market).
 
 
 [48]
 See Ass'n of Am. R.Rs. v. United States, 603 F.2d 953, 964 (D.C.Cir.1979) (presumption that "Congress [does] not employ superfluous language")
 A third reason to reject a broad definition of the term "note" is that this definition would include a number of instruments in which banks have traditionally traded--for example, certificates of deposit, notes evidencing a mortgage and notes representing commercial loans in connection with a loan syndication. All of these clearly involve a "written promise to pay a certain sum to the payee," see supra note 44; their sale by banks would therefore be prohibited by appellees' reading of the statute. Moreover, it makes little sense to argue, as do appellees, that we may escape this quandary by interpreting the Glass-Steagall Act to prohibit only banking practices not otherwise authorized by the banking laws: The banks may only exercise expressly granted powers in any event. See, e.g., Arnold Tours, Inc. v. Camp, 472 F.2d 427 (1st Cir.1972); Saxon v. Georgia Ass'n of Indep. Ins. Agents, Inc., 399 F.2d 1010 (5th Cir.1968).
 
 
 [49]
 See Federal Reserve Statement, supra note 3, at 14-15, J.A. at 233-34
 
 
 [50]
 This is particularly remarkable because, at the time the Glass-Steagall Act was passed, almost all commercial paper issued was purchased by commercial banks for their own account. See Hurley, supra note 5
 
 
 [51]
 S.REP. NO. 77, supra note 30, at 8 (emphasis added)
 
 
 [52]
 Id. at 9 (emphasis added)
 
 
 [53]
 Id. at 4 (emphasis added). The hearings and floor debates of the Act are also replete with evidence that Congress was concerned with banks' speculation in long-term equity and debt securities rather than with their participation in the commercial paper market. See, e.g., 77 CONG.REC. 3725, 3837 (1933) (remarks of Sen. Glass); Hearings, supra note 32, at 1006-19; Operation of the National and Federal Reserve Banking Systems: Hearings on S. 4115 Before the Senate Comm. on Banking and Currency, 72d Cong., 1st Sess. 146 (1932) (remarks of Sen. Glass); id. at 66-67 (remarks of president of American Bankers Association); 75 CONG.REC. 9904 (1932) (remarks of Sen. Walcott); id. at 9911-12 (remarks of Sen. Bulkley) (promotional pressures encouraging overdevelopment of collateral-security loans and over-production of capital securities)
 
 
 [54]
 Ch. 191, 44 Stat. 1224 (1927)
 
 
 [55]
 44 Stat. at 1226 (codified at 12 U.S.C. Sec. 24 Seventh (Supp. IV 1980)). The Act restricted bank holdings of the securities of any one obligor to twenty-five percent of the bank's holdings. Id. The Glass-Steagall Act further restricted the permissible amounts of these holdings. Ch. 89, sec. 16, 53 Stat. 162, 185 (1933) (later modified)
 
 
 [56]
 Federal Reserve Statement, supra note 3, at 9, J.A. at 228; 67 CONG.REC. 3232 (1926); H.R.REP. NO. 83, 69th Cong., 1st Sess. 3-4 (1926). Congress was legislating to control national banks' underwriting activities, which had sprung up in the early 1900s. In contrast, these banks had dominated the commercial paper market since the middle 19th century. See Federal Reserve Statement, supra note 3, at 10, J.A. at 229; A. GREEF, THE COMMERCIAL PAPER HOUSE IN THE UNITED STATES at 6-7, 15-18, 403-05 (1938)
 
 
 [57]
 Ch. 89, sec. 16, 53 Stat. 162, 185 (1933)
 
 
 [58]
 See S.REP. NO. 77, supra note 30, at 16 (banks permitted to purchase and sell investment securities "to the same extent as heretofore")
 
 
 [59]
 The conclusion that commercial paper is not a "security" or "stock" would follow a fortiori from the conclusion that commercial paper is not an "investment security." If commercial paper is a security but not an investment security, banks would be entirely forbidden from purchasing, selling, or underwriting commercial paper, while permitted, subject to the regulation of the Comptroller of the Currency, to purchase or sell corporate debt instruments. This would be quite anomalous, for corporate debt instruments threaten to a far greater degree to cause the evils at which the Glass-Steagall Act is aimed. Moreover, if commercial paper were deemed to be a "note" within section 21 of the Glass-Steagall Act, it ought also to be a "marketable obligation[ ] evidencing indebtedness ... in the form of [a] note[ ]"--i.e., an "investment security"--under section 16. That the legislative history and administrative implementation of the McFadden Act indicate clearly that commercial paper is not an "investment security" implies therefore that it should not be considered a "note" for the purposes of the Glass-Steagall Act
 
 
 [60]
 15 U.S.C. Sec. 77b(1) (1976) (Securities Act); id. Sec. 78c(a)(10) (Securities Exchange Act)
 
 
 [61]
 ICI II, supra note 22, 450 U.S. at 61 & n. 27, 101 S.Ct. at 984 & n. 27. See generally supra pp. 141-143
 
 
 [62]
 United Housing Found., Inc. v. Forman, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) (emphasis added)
 
 
 [63]
 The Supreme Court's recent interpretations of these provisions of the Glass-Steagall Act make no reference at all to the securities laws. See generally ICI I, supra note 37; ICI II, supra note 22
 
 
 [64]
 United Housing Found., Inc., 421 U.S. at 849, 95 S.Ct. at 2059 (emphasis added)
 
 
 [65]
 See infra p. 148 & notes 72-76
 
 
 [66]
 Appellees emphasize that, because Congress defined "security" in the Securities Act to include "any note," it must have intended "security" in the Glass-Steagall Act to mean the same thing. But all the example of the Securities Acts shows, of course, is that Congress is capable of using "securities" to include "all notes" when it clearly defines the term in that way. Indeed, the example of those Acts suggests that, if Congress had intended so sweeping a definition of "security" in the Glass-Steagall Act, it would have enunciated such a definition in the Act. Cf. American Tobacco Co. v. Patterson, --- U.S. ---- at ---- n. 6, 102 S.Ct. 1534 at 1539 n. 6, 71 L.Ed.2d 748 ("fundamental distinction" should not be imported into a statute unless Congressional intent is clearly expressed); Touche Ross & Co. v. Redington, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979) ("when Congress wished to provide [remedy], it knew how to do so and did so expressly")
 
 
 [67]
 --- U.S. ----, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982)
 
 
 [68]
 Id. at ----, 102 S.Ct. at 1222 (emphasis added) (citations omitted)
 
 
 [69]
 Id. at ----, n. 11, 102 S.Ct. at 1225 n. 11
 
 
 [70]
 Id. at ----, 102 S.Ct. at 1225
 
 
 [71]
 Federal Reserve Statement, supra note 3, at 19, J.A. at 237
 
 
 [72]
 Id
 
 
 [73]
 ICI I, supra note 37, 401 U.S. at 629-30, 91 S.Ct. at 1098
 
 
 [74]
 Id. at 635-38, 91 S.Ct. at 1101-02
 
 
 [75]
 Id. at 639, 91 S.Ct. at 1103. See also ICI II, supra note 22, 450 U.S. at 65-66, 101 S.Ct. at 986 (analyzing ICI I ) ("This Court's ... determination [that the units of participation were securities] led inexorably to the conclusion that Sec. 16 had been violated."). ICI II posed a different problem of statutory interpretation, as the Court itself noted. Id. at 66, 101 S.Ct. at 986. There, it was indisputable that the transactions under scrutiny involved "securities"; the question before the Court was whether the banks were "engaged in the business of issuing, underwriting, selling, or distributing" securities. Again, the Court embarked upon an analysis of the "hazards contemplated [by] Congress in enacting the Glass-Steagall Act" in order to conclude that the Act had not been violated. Id. at 66-67, 101 S.Ct. at 986-87
 Because we find that the commercial paper marketed by Bankers Trust is not a "security," we need not reach the issue, which arose in ICI II, of whether the bank is engaged in "underwriting" within the meaning of the Glass-Steagall Act.
 
 
 [76]
 Statement, supra note 3, at 17-20, J.A. at 236-39
 
 
 [77]
 See, e.g., D. HAYES, BANK LENDING POLICIES 89-91 (1977); J. CULBERTSON, MONEY AND BANKING 308-09 (2d ed. 1977). In considering the Glass-Steagall Act, Congress emphasized the distinction between short-term and long-term capital financing. See supra p. 145 & notes 52-53
 
 
 [78]
 See Pollock, Notes Issued in Syndicated Loans--A New Test to Define Securities, 32 BUS. LAWYERS 537, 538 (1977)
 
 
 [79]
 Federal Reserve Statement, supra note 3, at 3, J.A. at 222; Hurley, supra note 5, at 526-29. The Board's empirical studies found that the default rate on commercial paper is only a fraction of that on commercial loans. Companies which began to experience financial difficulties, such as Chrysler Financial Corp. and International Harvester Credit, must withdraw from the commercial paper market. Ironically, these corporations turn to commercial banks to meet their needs for current funding
 
 
 [80]
 See Report from the Board's On-site Investigation of Bankers Trust 2 (8 May 1980) (average maturity of Bankers Trust notes 60 days), J.A. at 200 [hereinafter cited as Report]; Federal Reserve Statement, supra note 3, at 2, J.A. at 221. See also Hurley, supra note 5, at 530; Comment, supra note 5, at 364. According to a Federal Reserve Board survey, the maturities of short-term commercial and industrial loans range from 36 to 105 days. 67 Fed.Res.Bull. A26 (Dec. 1981)
 
 
 [81]
 See Report, supra note 80, at 2, J.A. at 200. The minimum denomination Bankers Trust will sell is $100,000
 
 
 [82]
 Hurley, supra note 5, at 529; Comment, supra note 5, at 362-66
 
 
 [83]
 See sources cited at note 82 supra
 
 
 [84]
 Notably, securities differ strikingly from loans in all three respects. First, purchasers of securities, unlike purchasers of commercial paper, may liquidate their holdings, if at all, only at whatever price the market is currently paying for the stock. Second, because this price will fluctuate with the fortunes of the firm and with general economic conditions, holding securities is risky (though of course the degree of risk will depend on the profitability of the enterprise and the terms of the security agreement). Third, securities are generally available in much smaller denominations than commercial paper, so that they may be traded by the public on the open market
 
 
 [85]
 Federal Reserve Statement, supra note 3, at 19, J.A. at 238. When Congress passed the Glass-Steagall Act, this difference was less marked than it has been in recent years: banks not only arranged loans in private transactions, but also purchased the vast bulk of instruments sold through the commercial paper market. See id. at 18, J.A. at 237; Hurley, supra note 5, at 529. Compare supra p. 148 & n. 78 (in commercial bank loan, lender may be either the bank itself or a syndicate of other lenders)
 
 
 [86]
 See Becker, 519 F.Supp. at 615-16
 
 
 [87]
 See supra pp. 141-143
 
 
 [88]
 Report, supra note 80, at 4, J.A. at 202; Federal Reserve Statement, supra note 3, at 2
 
 
 [89]
 See supra pp. 148-149
 
 
 [90]
 See supra p. 149
 
 
 [91]
 See supra pp. 142-143
 
 
 [92]
 See Guidelines, supra note 13, at 29334. See also Report, supra note 80, at 4, J.A. at 202 (no evidence that funds borrowed from Bankers Trust are used to purchase its commercial paper)
 
 
 [93]
 See supra pp. 148-149
 
 
 [94]
 See supra p. 149
 
 
 [95]
 See supra p. 148
 
 
 [96]
 Finally, Bankers Trust may not "dump" its commercial paper through its trust department, for the Federal Reserve Guidelines prohibit bank sales of commercial paper to fiduciary accounts to which the bank gives investment advice. See Guidelines, supra note 13, at 29335 (Guideline # 7). Insofar as the conflict of interest presented here may be entirely eliminated by an authorized regulation of the Board, it can hardly be said to pose one of the "subtle hazards" against which the Act is directed. ICI I, supra note 37, 401 U.S. at 630, 91 S.Ct. at 1098. See also ICI II, supra note 22, 450 U.S. at 66-67, 101 S.Ct. at 986 (relying on Board guidelines in finding no "underwriting" by banks); cf. Marine Bank, --- U.S. at ----, 102 S.Ct. at 1225 (regulation of certificates of deposit by securities laws unnecessary because of extensive federal banking regulation)
 
 
 [97]
 See Guidelines, supra note 13, at 29334 (Guideline # 1). The Board's Guidelines, in addition to defining permissible types of commercial paper and permissible purchasers and sellers, require forms of disclosure, record-keeping, and credit analysis by commercial banks. See supra p. 8. These requirements are directed against the danger that sale of third-party commercial paper might involve "unsafe or unsound [banking] practices." In finding that the transactions regulated by the Guidelines do not involve a sale of securities, we do not rely on these additional requirements